**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERM DISTRICT OF WISCONSIN**

MCP IP, LLC,

      Plaintiff,

v.

RAVIN CROSSBOWS, LLC,

      Defendant.

§
§
§
§
§
§
§
§
§
§
§

Case No. 3:22-CV-00004-jdp

---

**<u>DEFENDANT RAVIN CROSSBOWS, LLC'S BRIEF IN
OPPOSITION TO PLAINTIFF MCP IP, LLC'S MOTION FOR
SUMMARY JUDGMENT AND MOTION TO STRIKE</u>**

<u>**TABLE OF CONTENTS**</u>

I.    INTRODUCTION ....................................................................................................... 7

II.   MCP'S PROPOSED CLAIM CONSTRUCTIONS ............................................... 11

  A.   Legal Standard .................................................................................................... 11

  B.   "cable positioner" Claim Terms ('375 / '757 / '665 / '433 / '939 Patents) .................... 12
    1.    The claim language in the '375 Patent family evidences the different contextual
    meanings of the term "cable positioner." ............................................................. 14
    2.    The claims and figures in the '375 Patent family support Ravin's contextual
    understanding of "cable positioner." .................................................................... 17
    3.    MCP cannot improperly add limitations to the claims – "a first cable positioner
    contacting the stock and moveable with respect to the stock" ................................ 19
    4.    The context of the claims and specification of the '433 Patent family likewise informs
    the meaning of the term "cable positioner." ........................................................ 21

  C.   "body" ('375 and '665 Patents) ........................................................................... 21

  D.   "guide member" ('375 / '757 / '665 Patents) ..................................................... 23

  E.   "stock" (all patents except the '220 Patent) ...................................................... 24

  F.   "extending between" ('375 / '757 / '220 Patents) ............................................. 31

  G.   "first [/ second] draw [/ drawn] position [/ orientation]" ('433 / '939 Patents) ............ 38

  H.   "structural portion of the stock" ('893 / '056 Patents) ...................................... 40

  I.    "A compound archery bow" ('220 Patent) ........................................................ 41

  J.    "cable guard" ('220 Patent) ................................................................................ 45

  K.   "said cable guard biasing the power cable in a lateral direction" ('220 Patent) ............ 46

  L.    "properly place a scope" ('435 Patent) .............................................................. 46

  M.   "said cheek rest comprising a peak" ('435 Patent) ........................................... 46

III.  RAVIN HAS ESTABLISHED A GENUINE DISPUTE OF MATERIAL FACT
REGARDING ITS INEQUITABLE CONDUCT ALLEGATIONS ........................................... 46

  A.   Summary Judgment Legal Standard .................................................................. 47

  B.   MCP's Distinction of the Location of the Latch Does Not Render Stryker Cumulative . 47

  C.   The Stryker Crossbow is not Cumulative of the Colley Reference ................. 53

  D.   There is Sufficient Evidence With the Likelihood of More Being Uncovered That
McPherson Intended to Deceive the Patent Office by Withholding Key Stryker Prior Art to
Advance and Secure His Position in the Marketplace ......................................................... 58

  E.   Conclusion .......................................................................................................... 62

IV.   RAVIN IS ENTITLED TO SUMMARY JUDGMENT OF NONINFRINGEMENT OF
THE '433 AND '939 PATENTS ........................................................................................... 63

V.    SUMMARY JUDGMENT IS INAPPROPRIATE ON THE HIGHLY FACTUAL INQUIRY OF OBVIOUSNESS AND MOTIVATION TO COMBINE FOR THE '433 AND '939 patents ..................................................................................................... 73

VI.    Ravin Has Established MCP's Identified Patents Are Invalid Under 35 U.S.C. § 112 .... 75

A.    "stock" ................................................................................................................. 75

B.    "properly place a scope" ('435 Patent) ............................................................ 80

C.    "said cheek rest comprising a peak" ('435 Patent) ......................................... 80

D.    "said cable guard biasing said power cable in a lateral direction" ('220 Patent) ............ 80

E.    "said cable separated from said shooting axis by a shortest distance as measured perpendicular to the shooting axis . . . the shortest distance being greater in the first draw orientation than in the second draw orientation" ('939 Patent, Claims 1 & 11) ...................... 81

F.    "said guide member comprises a channel, said second cable positioned in said channel" ('665 Patent) ................................................................................................................ 82

G.    "the riser defining a predetermined location" ('220 Patent) ............................................ 83

H.    "A compound archery bow" ('220 Patent) (Written Description) ................................... 84

I.    "the first rotatable member overlaps with the structural portion of the stock and a portion of the first rotatable member passes through a sidewall of the stock" ('893 Patent) ............... 86

VII.    MOTION TO STRIKE ................................................................................................. 89

VIII.    CONCLUSION .............................................................................................................. 94

## TABLE OF AUTHORITIES

### Cases

*Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. ) ..................................................... 62

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ............. 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................................................ 47

*Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 710 (Fed. Cir. 2020) ...................................... 76

*Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48, 1051 (Fed. Cir. 2016) (*en banc* ....... 9

*AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) .................................... 91

*baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) .................................. 17

*Better Mouse Co. v. SteelSeries Aps*, No. 2:14-cv-198-RSP, 2016 WL 7665908, *2 (Jan. 7, 2016
  E.D. Tex.) ....................................................................................................................................... 93

*Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ................................................................... 62

*Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004) ............................. 20

*CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) .................................... 52

*Convolve, Inc. v. Compaq Comput. Corp.*, 812 F.3d 1313, 1318 (Fed. Cir. 2016) ..................... 88

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380
  (Fed. Cir. 2011) (quoting *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed.
  Cir. 2010) (*en banc*)\ .................................................................................................................... 84

*Cuozzo Speed Technologies, LLC,* 793 F.3d at 1298 ................................................................... 14

*David v. Caterpillar, Inc.,* 324 F.3d at 857 ................................................................................. 93

*Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. ) ....................................................... 94

*GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014) ....................... 87

*Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001) ............. 88

*Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1375 (Fed. Cir. 1999) ............... 39

*In re Nuvasiv, Inc.,* 842 F.3d 1376, 1381-82 (Fed. Cir. 2016); ................................................... 74

*In re SP Controls, Inc.*, 453 F. App'x 990, 994 (Fed. Cir. 2011) ................................................ 52

*Infinity Computer Prods., Inc. v. Oki Data Ams., Inc.*, 987 F.3d 1053, 1060 (Fed. Cir. 2021).... 80

*Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324) ........................................................................................................................... 12

*Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) ................. 22

*Markman v. Westview Instr., Inc.*, 517 U.S. 370, 390–91 (1996)................................................. 11

*Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ....................... 87

*MLC Intellectual Property, LLC v. Micron Technology, Inc* ........................................................ 92

*Nat'l Prods., Inc. v. ProClip USA, Inc.* No. 20-cv-439-wmc, 2022 WL 2304114, *6 (W.D. Wis. June 27, 2022)........................................................................................................................ 61

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014) ......................................... 75

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1365, 1368 (Fed. Cir. 2005) (citing *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999)............... 12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2004) 37

*Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ...................................... 88

*Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1372–73 (Fed. Cir. 2002) ............................ 32

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 971 (Fed. Cir. 2018) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)) ... 12

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016) ........................................................................................................................................ 17

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)..................................... 82

*Schriber-Schroth Co. v. Cleveland Trust Co.* 305 U.S. 47, 57 (1938). ....................................... 85

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1367 (Fed. Cir. 2020) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ................................................................................................................................... 41

*Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009).......... 51

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014) ............... 20

*Southco, Inc. v. Fivetech Tech. Inc.*, 611 Fed. Appx. 681, 686 (Fed. Cir. 2015) ....................... 14

*Space Systems/Loral, Inc. v. Lockeed Martin Corp.*, 405 F.3d 985, 987 (Fed. Cir. 2005).......... 84

*SSI Techs., LLC v. Dongguan Zhenyang Elec. Mech. LTD.*, 59 F.4th 1328, 1334–35 (Fed. Cir.)87

*Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367–68 (Fed. Cir. 2012 ............... 14

*Tinnus Enterprises, LLC v. Telebrands Corp* ............................................................................. 14

*TNS Media Rsch., LLC v. TiVo Rsch. & Analytics, Inc.*, 629 F. App'x 916, 938 (Fed. Cir. 2015)
    (citing *O2 Micro*, 521 F.3d at 1360 ............................................................................... 87

*TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111,
    1124 (Fed. Cir. .................................................................................................................. 15

*Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir). .................................................. 90

*Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1381–82 (Fed. Cir. 2016) (citing *Phillips*, 415.
    F.3d at 1314–15) ............................................................................................................. 12

*Wyers v. Master Lock Co.*, 616 FG.3d 1231, 1237 (Fed. Cir. 2010) ........................................... 74

*X One, Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1035 (N.D. Cal. 2020) (citing
    *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir.
    2008) ................................................................................................................................. 82

**Statutes**

35 U.S.C. § 112 ............................................................................................................................. 7

## I.     INTRODUCTION

MCP moves for summary judgment regarding Ravin's inequitable conduct defense, infringement and validity of U.S. Patent Nos. 9,500,433 (the "'433 Patent") and 9,879,939 (the "'939 Patent"), and regarding all defenses and allegations Ravin has made under 35 U.S.C. § 112. MCP also moved to strike portions of the reports of Ravin experts Lauren Kindle and Dirk Duffner.

MCP does not present any issue in its summary judgment motion that should be granted by this Court. First, its motion attacking Ravin's inequitable conduct defense is both legally flawed and premature. MCP merely rehashes the very same arguments this Court already reviewed, and rejected, in its Order on Ravin's Motion for Leave to Amend its Answer. While MCP tries to repackage these arguments to give them a fresh look, they are the same arguments and can be denied for the same reasons. Perhaps most shocking from MCP's summary judgment motion is that it does not present a scintilla of evidence from Matt McPherson—the one person who knows the full story about why he decided purchase three Stryker crossbows, file patents claiming the same subject matter, and then decide not to tell the Patent Office about his three Stryker crossbows. Instead, MCP asks the Court to speculate on the various reasons that the Stryker is cumulative and immaterial, and then speculate further on the most reasonable inference for why McPherson hid the Stryker from the Patent Office.

In contrast, Ravin has presented evidence showing the Stryker was not cumulative and that an examiner would have found it very material to the prosecution of the '435 Patent. Moreover, Ravin has presented evidence from public statements nearly contemporaneous with the decision to withhold the Stryker crossbow that paint a different picture. By McPherson's own admissions in public news stories, in the leadup to 2012, the significant increase in crossbow sales in the archery industry represented a massive threat to his business, which solely focused on vertical bows. McPherson, a self-described vertical bow purist, admitted he only entered the crossbow market when pressured by his dealers, and only after his own dealers had cleared a huge portion of their shelf space to make room for crossbows. In McPherson's own words, he waited "longer

than he should have" to build a crossbow and gave up too much space to his competitors. He needed a crossbow, and he needed it fast. He also needed an edge in the marketplace against his competitors. The '435 Patent presented that opportunity. If it issued, it would allow him to further position his company as innovative, especially in a new area in which he previously had no presence. It also would give him a weapon against his competitors to use against others in the industry who might also want to move from vertical bows into the crossbow market. The problem with this plan? Stryker crossbows. If Stryker was disclosed to the Patent Office, the patents McPherson wanted and needed to position himself in the industry would be gone, along with the significant money he had spent to purchase those patent applications. Despite the inferences that MCP seeks to draw in its motion, the facts of this case—already with only limited discovery— show that the most reasonable inference to draw is that McPherson decided to keep the Stryker crossbows a secret from the Patent Office to protect his new investment in the crossbow industry. For this reason, the summary judgment motion should be denied.

But perhaps more problematic for MCP, its positions on the Stryker crossbow have put it in a fatal position trying to distinguish the Stryker prior art while maintaining its infringement allegations against Ravin. As the Court will see, MCP's positions between validity and infringement are untenable and further evidence why the Court should grant Ravin's request for summary judgment of noninfringement on the '435 Patent. Specifically, MCP attacks the Stryker crossbow by saying it is not material and irrelevant to the '435 Patent because the latch is not positioned directly underneath the cheek rest. The problem is, *all of the Accused Products in this case have the very same arrangement*:




Stryker Crossbow                          Ravin (R500)
Latch in cavity (purple), cheek rest in green        Latch in yellow. Cheek rest in green

If MCP is correct on its interpretation of the claims of the '435 Patent, then the Court should grant summary judgment of no infringement for the Ravin crossbows (as requested in Ravin's motion). MCP simply cannot have its cake and eat it too.

MCP also moves for summary judgment on the '433 and '939 patents seeking a finding that Ravin's R500 infringes. Not only should the Court deny this request but it should grant summary judgment of noninfringement to Ravin. The alleged invention described in the '433 and '939 patents is designed to use a cable positioner to physically move ("bias") the power cables out of the path of the arrow. This is necessary in these patents because they utilize a cabling arrangement where the power cables are connected from one cam (rotatable member) directly to another cam (rotatable member). In this arrangement, it leaves the power cables directly across the railing on which the arrow travels, which presents a significant safety problem. Ravin's products utilize an entirely different cabling arrangement where the power cables are connected from the top of one limb on one side to the bottom of the cam on the other side. This cam-to-limb arrangement naturally leaves the cables out of the path of the arrow and, thus, there is no need for a cable positioner that is designed to move ("bias") the cables out of the path of the arrow. For this reason, MCP's motion for summary judgment should be denied and Ravin's motion on the same issue should be granted.

MCP also moves for summary judgment attacking Ravin's invalidity positions for the '433 and '939 patents. MCP focuses its argument solely on the question of whether a person of ordinary skill in the art would have been motivated to combine the references. At its core, MCP presents nothing more than a battle of experts opining on a heavy factual inquiry—obviousness and the motivation to combine. The Federal Circuit has repeatedly held that the question of what a person of ordinary skill in the art would have been motivated to combine is a heavily factual inquiry. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047–48, 1051 (Fed. Cir. 2016) (*en banc*). This factual inquiry will include (1) an analysis of the scope and content of the prior art, (2) differences between the art and the claims at issue, level of ordinary skill in the art, and (4) the presence of

secondary considerations of nonobviousness. *Id.* On this heavy factual inquiry into 4 separate issues, MCP provides barely 1.5 pages of argument and just a few citations to its own expert. In essence, MCP provides citation to its expert who disagrees with Ravin's expert. This may be the case, but such a short argument is insufficient to overcome the significant factual disputes between the parties and, for this reason, should be denied.

MCP next turns to arguing against a number of defenses under 35 U.S.C. §112. Many of these defenses have been narrowed due to expert reports and Ravin only responds to a few remaining arguments within the brief below. Of the remaining disputes, Ravin has focused on issues that simply do not make sense for a jury. For example, the '220 Patent is solely directed to vertical bows, yet MCP is asserting it against crossbows. The patent simply lacks any written description support under §112 that would support this application against crossbows. In another example, MCP has inconsistently applied the term stock to Ravin's products depending on which patent it is asserting. By playing these types of games to avoid invalidity and support infringement, MCP's manipulations of what constitutes a stock have stripped it of all meaning rendering the term indefinite. As the Court will see, Ravin's §112 defenses are now narrowly tailored to provide the jury with the ability to see how MCP is inconsistently applying its claims and, for this reason, the motion should be denied.

Finally, MCP seeks to exclude opinions by Ravin's experts relating to potential design arounds. The thrust of MCP's argument seems to be that it dislikes the evidence because it shows the patents are, in large part, not worth the $12+ million MCP is demanding. Instead, they show that Ravin could modify its products to avoid infringement for as little as $25,000 in some instances. It is no surprise that MCP wants to prevent the jury from hearing this evidence—it makes clear the attorney fees for prosecuting the case will far exceed any potential damages. But other than MCP disliking this evidence, there is no basis to strike the evidence from the record. Ravin has disclosed these design arounds as they have been developed and approved in the litigation. In one instance that was before expert reports. And in another instance that was in connection with

expert reports. MCP cries foul because it claims prejudice in being unable to address these design arounds, but MCP ignores the fact that discovery remains open until August 18, 2023, which is five months after the disclosure of the last of Ravin's design-arounds. MCP has more than ample time to depose Ravin's experts, depose Ravin's engineers, and conduct an follow-up discovery it may need on these design arounds. Any potential prejudice due to the time remaining in discovery as of the filing of this brief would appear to be a problem of MCP's own making. It has only conducted one deposition of Ravin and, for wahtever reason, has not served a 30(b)(6) deposition or requested the deposition of any engineers involved with the design of the accused products, and had requested, then withdrawn, its depositions notices of Ravin's experts. It is difficult to comprehend how MCP can claim prejudice when it has refused to conduct discovery necessary to answer the questions it has about Ravin's design arounds.

## II.      MCP'S PROPOSED CLAIM CONSTRUCTIONS

MCP has proposed claim constructions for numerous claim terms, including both terms which Ravin addresses in its own Brief in Support of its Motion for Summary Judgment (Dkt. 78) and those which Ravin does not directly address in its own Brief. For the sake of clarity and brevity, Ravin will focus herein on rebutting MCP's proffered arguments, and will rely primarily on its own briefing for proffering its affirmative arguments. Furthermore, Ravin provides its own description of crossbow technology in its Brief and accompanying Proposed Findings of Fact (Dkt. 79) and will not duplicate that discussion here. To the extent a description of the technology is necessary, it is addressed within the particular term proposed for construction.

### A.      Legal Standard

Claim construction is a matter of law for the Court. *Markman v. Westview Instr., Inc.*, 517

U.S. 370, 390–91 (1996). "Claim terms are given their ordinary and customary meaning, which is the meaning the term would have to a person of ordinary skill in the art at the time of the invention." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 971 (Fed. Cir. 2018) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). While "'[t]here is no magic formula or catechism for conducting claim construction[,] . . . Claim language and the specification (written description) are the dominant sources of interpretation, and prosecution history can matter to a lesser degree[.]" *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1324).

A proper claim construction starts first with the claim language itself, and then "turn[s] to the intrinsic record to determine whether the context in which the disputed term sits shines light on its meaning." *Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1381–82 (Fed. Cir. 2016) (citing *Phillips*, 415. F.3d at 1314–15. Where "necessary, courts may also look to extrinsic evidence, often presented in the form of expert testimony." *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1365, 1368 (Fed. Cir. 2005) (citing *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

"Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001. "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Id.* (citations omitted).

## B.    "cable positioner" Claim Terms ('375 / '757 / '665 / '433 / '939 Patents)

Ravin did not propose a claim construction for the term "cable positioner" in its Brief (Dkt. 78) because the claim term does not need any further construction. It is easy enough to understand

in the context of the other constructions surrounding the term and the jury and any person of skill in the art will easily understand it. Thus, Ravin respectfully requests that no construction be applied to the term "cable positioner." However, to the extent the Court finds the term requires construction, MCP's construction of "an arrangement of components designed to position a cable" should not be applied by the Court because MCP's construction is done in a vacuum, devoid of the context necessary to give it meaning. That missing context is addressed below and, because similar arguments apply to both the '375 and '433 Patent families' construction of "cable positioner," both arguments will be addressed in this section.

Ravin's issue with this construction is not so much with the wording of MCP's construction as it is with MCP's apparent application of this construction. That is, the parties' dispute fundamentally boils down not to what a cable positioner is, but what the claims and the specification of the Asserted Patents specify *about* the cable positioner in any given claim. MCP argues throughout its brief that this "cable positioner,"—the "arrangement of components designed to position a cable"—may be *part of* the stock itself, but MCP's construction fails to take into account the various use of this phrase in different claims, the specification, and the figures.

For example, in the '375 Patent family, there are two separate cable positioners described in the claims, each with distinct features and requirements. The "first cable positioner [is] attached to [the] stock," and the "second cable positioner comprises an aperture in [the] stock." Dkt. 6-1, Claim 1, 7. MCP's arguments appear to conflate the separately claimed and distinct first and second cable positioners. If the Court limits MCP to properly applying the term as it used in context, MCP's remaining "cable positioner" constructions for the '375 Patent family are rendered superfluous. Accordingly, Ravin requests that the Court limit or otherwise clarify MCP's construction to the specific contexts in which it appears.

13

1.      *The claim language in the '375 Patent family evidences the different contextual meanings of the term "cable positioner."*

Turning first to the '375 and '757 Patents, claim 1 in the patents recites "a first cable positioner *attached to the stock*," and "a cable positioner *attached to said stock*," respectively. Dkt. 6-1, Claim 1 (emphasis added); Dkt. 6-2, Claim 1 (emphasis added). The first problem with MCP's construction is that something "attached to" the stock cannot *be* the stock itself. The Federal Circuit has repeatedly affirmed this fact by making clear that two components that are "attached" are not the same component. For example, in *Cuozzo Speed Technologies, LLC*, the Federal Circuit affirmed a construction of "integrally attached" as "***discrete parts*** physically joined together as a unit without each part losing its own separate identity." 793 F.3d 1268, 1280 (Fed. Cir. 2015), *en banc reh'g denied*, 793 F.3d 1297, 1298 (Fed. Cir. 2015) (emphasis added). There, the Federal Circuit denied the opposing construction, "joined or combined to work as a complete unit," which would have encompassed a speedometer that instead of being "attached" to a display as claimed, would be integrated into the display "such that there only is a single display." *Id.* The *Cuozzo* court mandated "[t]he word 'attached' must be given some meaning. . . . [I]t would be 'illogical to regard one unit as being 'attached' to itself.'" *Id.* Yet that is precisely the result that MCP's construction would dictate.

Similarly, in *Tinnus Enterprises, LLC v. Telebrands Corp.*, the Federal Circuit found a magistrate judge properly applied the plain and ordinary meaning of "attached" as meaning "connected or joined to something." 846 F.3d 1190, 1204 (Fed. Cir. 2017); *see also Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367–68 (Fed. Cir. 2012) (construing "attached to said pad" to encompass either external or internal attachment of a separate actuator component); *Southco, Inc. v. Fivetech Tech. Inc.*, 611 Fed. Appx. 681, 686 (Fed. Cir. 2015) (construing "attached" to require "direct attachment" of separate components). Thus, the plain language of the

14

claims, in view of the Federal Circuit's consistent constructions, mandates that the cable positioner, when read in the context of the claims as a part that is "attached to" the stock, must be a "discrete part" from the stock, and cannot be integral to the stock. To adopt MCP's construction, which would find the cable positioner and the stock the same component, would eliminate "attached" from being given any meaning and invite error. *Cuozzo*, 793 F.3d at 1298 ("[t]he word 'attached' must be given some meaning."). The same holds true for "a first cable positioner *contacting* the stock," as recited in claim 1 of the '665 Patent. Dkt. 6-3, Claim 1 (emphasis added); *see TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1124 (Fed. Cir. 2001) (applying ordinary meaning of the term "contact" to mean "touching").

MCP next argues Ravin's construction would render dependent claims 4, 5, 7, 8, 9, 11, 12, 13, and 17 "necessarily contradictory" to independent claim 1. Yet, here again, MCP's argument must be rejected because it ignores the context in which the term "cable positioner" appears. For example, claim 4 (and claim 5, which depends from claim 4) recites the following:

> The crossbow of claim 1, wherein said first cable positioner comprises a body portion supported by said stock and a guide member arranged to move with respect to the body portion, said guide member contacting said first cable.

Dkt. 6-1, Claim 4. Like claim 1, claim 4 requires the "cable positioner" be "supported by said stock." *Id.* That is, claim 4, like claim 1, requires one distinct component (the body) be "supported by" a second distinct component (the stock). It is unclear how requiring the cable positioner recited in these claims to be a separate component distinct from the stock would render claims 4 or 5 "necessarily contradictory" as MCP asserts. Instead, the opposite is true. When a proper construction and understanding of "attached" and "supported" is applied, each of these claims are consistent and in line with Federal Circuit precedent. The same holds true for most of the remaining claims MCP identifies (claims 8, 9, 11, 12, 13, and 17). For example, claims 8 and 9 delineate

15

distinct components for the second cable positioner, each of which are each identified and claimed separately from the stock. Similarly, claims 11, 12, and 13 recite the cable positioner comprising a "roller," which again, is a separate and distinct component from the stock. And claim 17 further delineates features of the "first cable positioner," which as explained must be "attached to" (i.e., distinct from) the stock.

Only when we get to claim 7 does the term "cable positioner" appear to support MCP's arguments that such a cable positioner may be part of the stock itself. But a careful reading of the claims quickly shows the flaw in MCP's argument. Claim 7 recites the following:

> The crossbow of claim 6, wherein ***said second cable positioner*** comprises an aperture in said stock.

Dkt. 6-1, Claim 7 (emphasis added). The most important thing to note in this claim is that claim 7 distinctly claims a "***second*** cable positioner," which is a separately claimed component from the "first cable positioner" of claim 1. *Id.* In other words, to infringe claim 7, a crossbow would need *both* a "first cable positioner" that is separate and distinct from the stock and a different "second cable positioner" which "comprises an aperture in [the] stock." *Id.* And with the "second cable positioner," there is no prior claim language requiring the second cable positioner be "attached to" the stock. Thus, when read in context, there is no requirement that the "second cable positioner" of claim 7 be a separate physical component from the stock. This is why context matters in claim language and why MCP's arguments must fail.

Furthermore, this context-based understanding of a "cable positioner" does not exclude any preferred embodiments from the scope of the claims, as MCP alleges. Instead, when the cable positioner of claim 1 is read in context, the applicable embodiments are readily apparent. The fact that this context excludes certain embodiments listed in the specification is of no great import. Indeed, a patentee may choose to claim only certain embodiments disclosed in the specification in

16

any given claim. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016 ("A construction which reads the preferred embodiment out of the scope of the claims would generally seem at odds with the intention of the patentee as expressed in the specification. This does not mean, however, that each and every claim ought to be interpreted to cover each and every embodiment." (internal citations omitted)); *baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment."). The '375 Patent family is a prime example of a case in which the patentee intentionally did not claim every embodiment in every claim. For example, '375 Patent claims 11–13 and '757 Patent claims 4–6 and 10–14 claim only those embodiments that include a roller (the Figure 7 embodiment). *See* Dkt. 6-1, Claims 11–13; Dkt. 6-2, Claims 4–6, 10–14. The same logic applies to the Asserted Claims. For example, '375 Patent claims 1 and 18 claim only the embodiment in which the first cable positioner is a separate piece "attached to" the stock, not an embodiment in which the first cable positioner is integral to the stock. Accordingly, reading the term "cable positioner" properly in context does not improperly read out preferred embodiments, as MCP contends, because the claims are clearly directed to only a limited subset of the disclosed embodiments by their very language.

### 2. The claims and figures in the '375 Patent family support Ravin's contextual understanding of "cable positioner."

The '375 Patent specification[1] and figures likewise show that the first and second cable positioners are different components with different related teachings and attributes. As such, depending on the claim language these terms may very well need to be treated differently. For example, the '375 Patent specification states, "[t]he first cable positioner is arranged to hold the

---

[1] The '375, '757, and '665 Patents share a common specification. For brevity, Ravin cites the '375 Specification as representative.

first cable above the shooting axis, and the second cable positioner is arranged to hold the second

cable below the shooting axis." Dkt. 6-1, 1:62–65. Similarly, Fig. 2 shows a close-up of "the first

cable positioner 48" "*attached to*" stock 40 (separate component). *Id.* at Fig. 2. Whereas "a second

cable positioner 50" which "comprises a body 30" is shown as integral to the stock in Fig. 2. *Id.*



FIG. 2

*Id.* Everywhere the '375 Patent references a "first cable positioner," such "first cable positioner"

corresponds to reference numeral 48.[2] In turn, the '375 Patent only depicts reference numeral 48

---

[2] The '375 Patent once refers to "the second cable positioner 48," but this is clearly a typo. The

description of "the second cable positioner 48" identifies components that are part of "second cable

positioner 50," such as "recess or channel 51," displayed as part of the lower, second cable

positioner in Fig. 2. The remaining references to reference numeral 48 are identified as "first cable

positioner 48." *See* Dkt. 6-1. Accordingly,  "second cable positioner 48" is a typo, and should read

as a separate component attached to the stock 40 by what appear to be fasteners. *See id.* at Figs. 1, 3–11. This is in contrast to the '375 Patent's depiction of the "second cable positioner 50," which is depicted in some embodiments as groove in stock 40. *See id.* at Figs. 1, 3. Accordingly, the first and second cable positioners have different requirements both from the specification and the language of the claims themselves. Therefore, Ravin respectfully suggests that no construction is necessary, but should the Court provide a construction, any such construction must be read in the proper context in which the claim terms are located.

### 3. *MCP cannot improperly add limitations to the claims – "a first cable positioner contacting the stock and moveable with respect to the stock"*

MCP's construction of "a first cable positioner contacting the stock and moveable with respect to the stock" is a further example of MCP trying to read out the context of the claims. The phrase "a first cable positioner contacting the stock and moveable with respect to the stock" from the '665 Patent is clear and requires no further construction for the jury or a person of ordinary skill to understand. The Court need only apply its plain and ordinary meaning. Yet MCP seeks to rewrite the entire construction with its proposal: "an arrangement of components designed to position a cable contacting the stock at least a portion of which is moveable with respect to the stock." The first problem is that MCP rewrites a "cable positioner" into a "arrangement of components." This is error. The phrase unequivocally requires "a first cable positioner" that is "moveable with respect to the stock," not individual components. Throughout the '375 Patent family, including the '665 Patent, the drafter made distinctions between the components that make up the "cable positioner," and the "cable positioner" itself. For example, dependent claim 5

---

"second cable positioner [50]," continuing with the '375 Patent's identifying the first and second cable positioners as distinct components.

specifies separate components of the "cable positioner" which move along a given axis. *See* Dkt. 6-3, Claim 5. Thus, the drafter knew how to make such distinctions, and unequivocally claimed an arrangement wherein the "cable positioner"—not a *portion* of the cable positioner—is "moveable." *Id.* at Claim 1. Whether that was the intent of the drafter or not is irrelevant; that is what is claimed. *See Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014) ("a court may not rewrite a claim even if giving a disputed claim its plain meaning would lead to a 'nonsensical result'"); *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004 ("even a nonsensical result does not require the court to redraft the claims of the ['665 patent"). MCP has not contended the wording is a draftsman's mistake and has taken no extraneous efforts with the Patent Office to seek a certificate of correction. Thus, the claim should not be rewritten here. *See id.* (finding the same facts weighed against rewriting the claims to effect the patentee's intended function).

In light of this Federal Circuit precedent, any argument MCP makes that Ravin's construction leads to a "nonsensical result" is inapposite. MCP's only remaining argument, then, is that Ravin's construction reads out embodiments in which the "cable positioner" is part of the stock. The problem with this argument was detailed at length above—it fundamentally ignores the claim language and the context in which the "cable positioner" appears with regard to other components. Here, as above, is another clear example of claim language requiring the cable positioner be a component separate from the stock, since the claim indisputably states that the cable positioner "contacts" the stock and is "moveable with respect to the stock." Dkt. 6-3, Claim 1. Accordingly, in the context of the specific claims in which this phrase appears, the entire multi-component cable positioner must be "moveable with respect to the stock," and reading in the extra limitation of "at least a portion" improperly reads out the context of both the language in which

20

the phrase appears and the language of the surrounding claims.

### 4. The context of the claims and specification of the '433 Patent family likewise informs the meaning of the term "cable positioner."

Turning next to the '433 and '939 Patents' use of the claim term "cable positioner," Ravin proposes again that this claim term needs no further construction. It appears as though MCP may agree, given that it is unclear what, if anything, their construction clarifies beyond the plain and ordinary meaning of the claim term itself. However, to the extent the Court finds the term requires construction, caution must be taken (and clarification given) if MCP's construction of "a device that positions a cable" is adopted because MCP's construction ignores (and is often inconsistent with) the context in which the claim term appears. Unsurprisingly, the context of the Asserted Claims from the '433 and '939 Patents again require that the cable positioner be a separate component from the stock. For example, '433 Patent claim 1 recites "the cable positioner *moving with respect to the stock*." Dkt. 6-4, Claim 1 (emphasis added). The cable positioner could not "mov[e] with respect to the stock" unless it is a separate component distinct from the stock. *Cuozzo*, 793 F.3d at 1280. Accordingly, MCP should likewise be precluded from arguing in the context of the '433 Patent family that the "cable positioner" is integral to the stock in any way because it renders other claim language obsolete and superfluous.

### C. "body" ('375 and '665 Patents)

Ravin proposes that the claim term "body" requires no further construction, as its plain and ordinary meaning is clear. MCP argues "[t]he claim term 'body' has little meaning outside the specification and the claims," and proposes a complex phrase for a simple, single word term—"a part of a cable positioner that is immovable with respect to the stock while the crossbow is being drawn." But no further construction is necessary, especially not one that takes a single word and converts it into a 20 word phrase.

The Federal Circuit has long made clear that the plain and ordinary meaning of a claim term is informed by the intrinsic record, i.e., the patent claims, specification, and prosecution history. *See, e.g., Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011) ("The customary meaning of a claim term is not determined in a vacuum and should be harmonized, to the extent possible, with the intrinsic record…"). The intrinsic record in this case sufficiently informs a person of ordinary skill as to the meaning of the claim term "body," and thus the term requires no further construction.

'375 Patent claims 4, 10, 17, 19, and 20, and '665 Patent claim 11 recite the claim term "body." Dkt. 6-1; Dkt. 6-3. Each and every appearance of the term "body" identified by MCP refers to embodiments in which the cable positioner is separate and distinct from the stock ("attached" in the '375 Patent, "contacting" in the '665 Patent). MCP's own construction appears to implicitly admit this, as it requires "a part . . . that is *immovable with respect to the stock*," suggesting the distinctness of the components. This makes sense. As explained above, something "moveable" or "immovable" "with respect to the stock" must be a component separate and apart from the stock. Something does not move (or remain stationary) with relative to itself.

Only one component from the specification clearly fits this requirement: "body 24" (shown in Fig. 2, below). *See* Dkt. 6-1, 3:11–20.



FIG. 2

*Id.* at Fig. 2. MCP's construction underhandedly attempts to include "body 30" in its construction. But the context of the claim language does not bear this result, since the '375 Patent distinctly teaches "body 30 comprises a portion of the stock 40." *Id.* at 4:12. Thus, a POSITA reading the claims in light of the specification would find the only "body" component referenced as being "attached to" or "contacting" the stock, and which is not "a portion of the stock," with little to no effort or confusion. *See id.* Accordingly, the Court should find that this claim term requires no further construction, and should limit MCP to applying its claim terms properly based on the context in which they appear.

### D. "guide member" ('375 / '757 / '665 Patents)

Ravin again proposes that the claim term "guide member" requires no further construction. This is another example of where MCP's construction adds nothing to the plain language in light of the specification. By seeking to construe "guide member" as "structure of a cable positioner

arranged to guide and/or be moved by a cable," MCP's proposal adds unnecessary words and complexity to a simple 2-word phrase. It appears as though MCP's construction is premised on the assumption that Ravin is trying to construe "cable positioner" in the '375 Patent family as a singular component and not "an arrangement of components" as MCP propounds. Since Ravin is not doing so, and since it is unclear what MCP's construction adds that is not readily apparent from the plain and ordinary meaning of "guide member" in view of the specification and claims, the Court should decline to provide any further construction to the phrase "guide member."

**E.      "stock" (all patents except the '220 Patent)**

Ravin addresses this term in detail in its Brief. Dkt. 78 at 5–12. MCP proposes "a supporting framework or structure" as its omnibus construction applicable to all patents that use the term. Ravin proposes the Court construe the term as "the central component of the crossbow to which everything else attaches." Ravin's construction is far more consistent with the disclosure of every Asserted Patent that claims a "stock." The Asserted Patents repeatedly and consistently refer to the various components of a crossbow as being "attached to" the stock. *See, e.g.,* Dkt. 6-1, Claim 1 ("a first cable positioner *attached to said stock*" (emphasis added)).

For example, the '375 Patent family teaches a stock 40 to which everything else attaches. For example, the '375 Patent teaches the "first cable positioner 48" is "attached to the stock 40." *Id.* Similarly, the "body 30" which is part of the "second cable positioner" can either "comprise[] a portion of the stock" or be "attached to the stock 40." *Id.* at 4:12, 4:19–20. Fig. 1 depicts the stock 40, and demonstrates how all other components attach to the stock:



FIG. 1

*Id.* at Fig. 1. Fig. 1 demonstrates that the remaining components, such as limbs 12 and the scope rail all attach to the central component of the crossbow—the stock. *Id.*

And the prosecution history of the '375 Patent compels the same conclusion. As Ravin explains in its own Brief, the '375 Patent was originally rejected over another patent issued to Darlington. In that rejection, the Examiner identified component 12 of Darlington, depicted below, as the "stock":



**FIG. 1**

Dkt. 78, at 7–8. As Darlington's Fig. 1 shows, reference numeral 12 (identified as the stock by the examiner) is the component of the Darlington crossbow to which the remaining components attach. *Id*. at 7. Indeed, reference numeral 12 points to almost the exact same spot on the crossbow as the '375 Patent's reference numeral 40 in Fig. 1. This indicates the Examiner was applying the same construction to, and understanding of, the term "stock" that Ravin now proposes. *Id*. But more importantly, MCP's response to the rejection shows it applied the same understanding as the Examiner. *Id*. at 7–8. To overcome the rejection, MCP added narrowing limitations to certain claims requiring the cable positioner to be "attached to the stock," citing Fig. 1 as support. *Id*. This "attachment" is clearly depicted in original Fig. 2 from the '375 Patent's Application:

26



*Id*. at 8. Here, the light grey (bare metal) cable positioner comprises a body 24 fixedly attached to the stock via two fasteners. *Id*. Thus, as it relates to the '375 Patent family, both the language of the patents as well as MCP's own understanding as evidenced in the prosecution history demonstrate that Ravin's construction is correct.

The '433 Patent family similarly supports Ravin's construction. For example, with reference to Fig. 2, the '433 Patent states "the crossbow 10 comprises a stock 12, a trigger 14, a string latch 16, and a bow portion 20. . . . The bow portion 20 can comprise any suitable type of bow. In some embodiments, the bow portion 20 comprises a prod 22 *that attaches the stock 12*, a first limb 24 and a second limb 26." *Id*. at 8–9. Figure 2 of the '433 Patent, reproduced below, demonstrates that the stock 12 is the central component to which everything else attaches:



FIG. 2

*Id*. at 9. As described, limbs 24 and 26 connect through prod 22 to the stock. Trigger 14 is connected to the stock. The scope rail attaches to the stock. The handgrip and foregrip are connected to the stock. The centrality of the stock is made clear through this Figure (and others in the '433 Patent). *Id*. The stock is always the central component to which everything else attaches. *Id*.

The '435 Patent also supports Ravin's construction. For example, with reference to Fig. 2, the '435 Patent notes "a crossbow is shown comprising a bow portion 30, a barrel 14, a stock 16, a latch 20 and a trigger 24. The bow portion 30 desirably comprises at least one limb 34 and a string 42." *Id*. at 9–10. Fig. 2, reproduced below, makes clear that the stock is the component to which the other named components attach:

28



FIG. 2

*Id.*

And again, the '893 Patent family describes, with reference to Fig. 1, "a crossbow 10 comprises a stock 20, a trigger 12, a latch 14, and a bow portion 30. In some embodiments, the bow portion 30 comprises a prod 32. In some embodiments, the prod 32 is attached to the stock 20. In some embodiments, the prod 32 supports a first limb 40 and a second limb 42." *Id.* at 10–11. Fig. 1 is reproduced below:



FIG. 1

*Id*. Here again, the stock 20 is depicted as the component to which everything else attaches. For example, the prod 32, limbs 40/42, scope rail, handgrip, trigger 12, latch 14, and more are all attached to the central component—the stock. *Id*. at 11. There is no other disclosure in the '893 Patent that describes any other arrangement; the stock is always the central component to which everything else attaches. *Id*.

Even MCP's own arguments seem to suggest the validity of Ravin's construction. For example, if the stock is "supporting" other components, as MCP posits, then those components must be attached, either directly or indirectly, to the stock. But MCP's construction fails to give guidance on where the stock begins or ends, i.e., what is and is not part of the "stock." Is MCP

contending that anything rearward of the latch ceases to be the stock? Surely not. Is MCP contending that the prod, which is a "supporting framework or structure" for the limbs, is a claimed "stock"? Again, surely not, especially considering that MCP's claims and specifications make a distinction between the prod and the stock. *See, e.g.,* Dkt. 6-7 ('893 Patent), Claim 1 ("a stock comprising a structural portion . . . the bow portion comprising a prod"). And the same applies to the limbs, the cams, the scope rail and more, which are "supporting framework[s] or structure[s]" for the cams, the bowstring and cables, and the scope, respectively. This ambiguity illustrates why MCP's construction is not only unhelpful, but untenable because it would leave the jury and Court to guess whether any given component that "support[s]" another component qualifies as a "stock."

MCP also attempts to muddy the water by reading in further limitations to Ravin's construction, namely, that every component "must directly attach to the stock." Dkt. 82, at 20. But this is not Ravin's argument. Nowhere in the briefing has Ravin argued that every single component must "directly attach to the stock." Thus, this argument from MCP is a red herring and can be ignored. MCP also argues "Ravin's construction [] fails to acknowledge that the stock is the supporting framework of a crossbow . . ." and that "the stock has [a] basic structural function." *Id.* But this argument also is a red herring. If the stock is the central component to which everything else attaches—as Ravin proposes—then it must provide support and a structural function. Accordingly, because Ravin's construction is supported by the intrinsic record of all Asserted Patents, and because MCP's construction is unworkably overbroad and unsupported, the Court should adopt Ravin's construction.

## F. "extending between" ('375 / '757 / '220 Patents)

MCP argues "extending between" should be construed as "at, into, or across the space separating," based on the "definition of 'between.'" MCP's construction attempts to stretch the

claim term well beyond the meaning it can support, again in a vain attempt to keep its infringement theories alive. Not surprisingly, MCP's construction relies primarily on extrinsic evidence because the intrinsic evidence favors Ravin's proposed construction. MCP's suggested approach of looking to extrinsic evidence to override intrinsic evidence invites error and should be avoided.

MCP's construction is primarily based on extrinsic evidence, namely, a definition from the Concise Oxford English Dictionary. Yet, under the very same caselaw cited by MCP, the Court can rely on extrinsic evidence "***[o]nly if*** a disputed claim term remains ambiguous ***after analysis of the intrinsic evidence***." *Pickholtz v. Rainbow Techs., Inc.*, 284 F.3d 1365, 1372–73 (Fed. Cir. 2002) (emphasis added); Dkt. 82 at 8. Because Ravin identifies ample extrinsic evidence in support of its construction, and because that intrinsic evidence leaves no ambiguity, there is no need to turn to extrinsic evidence to construe this claim term. *See Pickholtz*, 284 F.3d at 1372–73.

As established in its Brief, Ravin proposes construing "extending between" as "extending between and contacting the first rotatable member and contacting the second rotatable member." Dkt. 62-1. As the intrinsic record shows, when properly construed each claim using this phrase requires that the bowstring, first cable, and second cable all extend between, and contact, the first and second rotatable members. Dkt. 78, at 13–16. For example, the '375 Patent describes "a bowstring, a first cable and a second cable each extend between the first rotatable member and the second rotatable member." *Id*. at 13–14. Each and every embodiment (as depicted in the Figures) has a bowstring and first and second cables (the so called "power cables") extending between— and contacting or connecting to—the first and second rotatable members. *Id*. at 13. Reproduced below is '375 Patent annotated Fig. 1 from Ravin's Brief:



*Id.* at 13.. The red bowstring and blue power cables clearly extend between—and contact/connect

to—the rotatable members. *Id.* The '375 Patent clarifies that the bowstring, first cable, and second

cable's connection to the rotatable members is necessary for the operation of the claimed invention.

*Id.* Specifically, as the crossbow is drawn, the bowstring unwinds from the rotatable members, and

the first and second cables are taken up by the rotatable members, as depicted below in annotated

Fig. 2 from Ravin's Brief:



FIG. 3

*Id.* at 13–14.

If the bowstring was not connected to the rotatable members (the cams), the bow would simply not function as intended. The same applies to the first and second (power) cables. Indeed, in discussing Fig. 3, the '375 Patent explains "drawing the bowstring 16 causes the rotatable members to rotate, where at least one of the first or second cables 18, 19 ***will be taken up on a cam track 15*** . . . caus[ing] the limbs 12 to flex, storing energy." *Id.* at 14. Discussing Fig. 10, the '375 Patent similarly explains the following:

> [A] cable 18, 19 comprises an end portion 68 ***that is arranged to feed out*** from the rotatable member 14 during at least a portion of the draw cycle. In some embodiments, an end portion 68 ***is arranged to unspool from the rotatable member*** during at least a portion of the draw cycle. In some embodiments, an end portion ***68 wraps around at least a portion of spool*** member 74 in the brace condition.

*Id.* at 14–15. This is just a sampling of the examples expressly described in the '375 Patent and its intrinsic record laid out in Ravin's Brief (Dkt. 78), which describes the ample evidence supporting

this construction. Given the '375 Patent's extensive intrinsic evidence, the only proper construction for "extending between" must require that each of the bowstring, first cable, and second cable extend between, and contact (or otherwise be connected to) to, the first and second rotatable members.

MCP only provides a single citation to the intrinsic record which actually supports Ravin's position. MCP excerpts '375 Patent Figs. 5 and 6 attempting to demonstrate that the component (which MCP refers to as an anchor) does not rotate with the rotatable member. But the Figures clearly demonstrate that the identified anchor *does* in fact rotate. Annotated Figures 5 and 6 (below) clearly show this to be the case:



Dkt. 6-1, at Figure 5 (annotated). Figure 5 depicts the cams in an undrawn orientation. *Id*. The red arrow indicates the direction the cam will rotate when the crossbow is drawn, which will unspool the bowstring 16 as the cam rotates. The orange dot marks a reference point on the cam near the bowstring in the undrawn orientation, the blue dot marks the anchor point for the bowstring, and the red dot marks a reference point on the anchor point of the power cable on the edge of the depicted cutout nearest the bowstring anchor.

35



*Id*. at Figure 6 (annotated). Figure 6 depicts the cams in a drawn orientation. Again, the red arrow indicates the direction the cam rotated from the undrawn position. The orange dot marks a reference point on the cam near where the bowstring laid in in the undrawn orientation, the blue dot marks the anchor point for the bowstring, and the red dot marks a reference point on the anchor point of the power cable on the edge of the depicted cutout nearest the bowstring anchor. As can be seen, the red dot rotated in the direction of the red arrow, moving beneath the limb, ending on the outside of the of the limb compared to its starting position on the inside of the limb. The blue and orange dots illustrate that the cam moves as a whole throughout its rotation, maintaining the same relative positioning of the three dots as they rotated through space. Accordingly, despite MCP's assertions, the anchor is not "completely independent of the rotation of the rotatable member 14," but instead is part of, and rotates with, the rotatable member 14. Thus, the '375 Patent *does* depict the first and second cables contacting and connecting to the rotatable member, which *does* rotate relative to the cable 18. As these annotate figures show, Ravin's construction does not

36

"exclude the preferred embodiments in the specification," as MCP claims.[3] This action also can be clearly seen when using the Mathews V3x bow, which MCP claims is a commercial embodiment of the '220 patent. The demonstration of this bow can be shown during the oral argument if the Court is inclined to observe the operation of the cams and their rotation "in real life" (so to speak).

MCP's construction also fails because it would render the claims inoperable and insurmountably ambiguous. MCP's construction provides no understanding of how it would be applied or what components would, or would not, meet the limitation. It would leave jurors and the Court to guess what "at, into, across a space" means, or what the bounds of such a construction are. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2004) (finding a construction was legally insufficient where it did not resolve the parties' dispute and left the parties to "provid[e] an argument identifying the alleged circumstances when the requirement specified by the claim term must be satisfied"). Indeed, as above with the "stock" limitation, MCP's construction would apply to nearly anything on the crossbow, since the cams are typically the outermost point on a crossbow. Thus, almost anything on the crossbow is "at . . . the space separating" the cams. For example, MCP's construction would include the stock as "extending between" because it is located "at . . . the space separating" the rotatable members? Surely not. The same would apply for other components such as the trigger, scope, and arrow

---

[3] For the same reasons illustrated through Ravin's annotated figures, MCP's arguments regarding the '220 Patent also fail. Specifically, as MCP points out, the '220 Patent describes an embodiment in which the "anchor (e.g. 50) [is] on or near the opposite rotatable member (e.g. 20)." Dkt. 82, at 21–22.

quiver because they are all located "at … the space separating" the rotatable members. But such a construction is nonsensical and untenable. Accordingly, the Court should reject MCP's construction, and adopt Ravin's construction: "extending between and contacting the first rotatable member and contacting the second rotatable member."

**G.    "first [/ second] draw [/ drawn] position [/ orientation]" ('433 / '939 Patents)**

MCP appears to be arguing that a crossbow has infinitely many draw positions, and consequently, that any of these infinitely many draw positions may be a "first" or "second" draw position. While that may be logically true, MCP again asks the Court to remove these terms from the context of the patents that inform their meaning. Yet again, the Court should reject MCP's arguments.

Although a patent typically may use "first" or "second" to simply distinguish different orientations, the Asserted Patents (which share a common specification) do not use the terms in this manner. Instead, the '433 Patent clearly defines the second position as the cocked orientation: "[a]lthough the cable positioner 40 will move to a second position when the crossbow is cocked . . . ." Dkt. 6-4, 4:39–41. Similarly, the first position is defined as the undrawn orientation: "upon firing, the cable positioner 40 move [*sic*] backward toward the first position . . . ." Dkt. 6-4, 4:41–42 (emphasis added). And the '433 Patent describes the invention's embodiments in terms of distinctions between the brace and cocked orientations:

> For example, in some embodiments, a distance between the shooting axis 46 and the first cable 34 in a brace orientation is different from the distance in a cocked orientation. (Dkt. 6-4, 3:41–44).

> In come embodiments, the cables 34, 36 are positioned closer to the shooting axis 46 when the crossbow 10 is cocked than when the crossbow 10 is at brace. This arrangement is desirable because the lateral displacement is reduced when the forces in the cables 34, 36 are higher. (Dkt. 6-4, 3:65–4:2).

For example, in some embodiments, a distance between the shooting axis 46 and the cable positioner 40 in a brace orientation is different from the distance in the cocked orientation. (Dkt. 6-4, 4:22–25).

This dichotomy comports with the typical understanding of a crossbow. While a crossbow may theoretically have any number of "draw positions," crossbows such as those shown in the '433 Patent family have only two meaningful draw orientations: cocked (or drawn) and brace (or undrawn). For example, in the "Background of the Invention" section, the '433 Patent describes only two orientations for crossbows: "in a brace condition, the harness cables can apply a force of 30 pounds or more to the stock. When the crossbow is cocked, the tension in the harness cables can increase twofold or greater, resulting in a force of 60 pounds or more being applied to the stock." Dkt. 6-4, 1:34–38. The Figures likewise only depict a crossbow in one of these two orientations, with Figures 1 and 2 "show[ing] an embodiment of a crossbow in a brace condition," and Figures 3 and 4 "show[ing] the crossbow of Fig. 1 in a cocked condition." Dkt. 6-4, 2:35–38.

This makes sense. When looking at the figures there is only a single latch to hold the crossbow in its fully drawn position. *See generally* Dkt. 6-4, at Figures. There is no other way disclosed in the patents to draw the patent to any position other than fully drawn or fully undrawn (brace). *Id.* The disclosures in the '433 Patent are more than sufficient to establish that the patentee was acting as his own lexicographer, defining the first and second draw positions as the brace and cocked orientations, respectively. *See Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1375 (Fed. Cir. 1999) ("patentees may choose their own descriptive terms as long as those terms adequately divulge a reasonably clear meaning to one of skill in the art"); *Digital Biometrics v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) ("The written description is considered, in particular to determine if the patentee acted as his own lexicographer, as our law permits, and ascribed a certain meaning to those claim terms."). Thus, it would be error to allow MCP to read

these claim terms outside of the context which informs their proper meaning. Accordingly, the Court should reject MCP's construction, and adopt Ravin's construction, wherein the "first draw position" is the "brace or decocked orientation" and the "second draw position" is the "fully drawn or cocked orientation."

H.      "structural portion of the stock" ('893 / '056 Patents)

MCP proposes construing this term as "the portion of the stock extending between a fire control assembly and the attachment to the prod." Dkt. 82 at 26. However, this term requires no further construction, as its ordinary meaning is readily apparent. *See O2 Micro*, 521 F.3d at 1360 ("the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words"). In this case, the meaning of the "structural portion" of the stock is readily apparent, and further claim construction—even using MCP's proposed construction—would involve "little more than the application of the widely accepted meaning of commonly understood words." *Id.* As MCP admits, "[t]he patent specification makes clear what is, and what is not, considered the 'structural portion of the stock.'" Dkt. 82 at 26. Thus, MCP implicitly admits that this term requires no further construction, and it remains unclear what MCP seeks to gain through further construction of this term.

Moreover, Ravin explained in detail above why its construction of "stock" is proper, and why MCP's construction is improper. MCP's proposed construction for this term further highlights why MCP's construction is erroneous. Namely, for "stock," generally, MCP proposes "a supporting framework or structure." Dkt. 82 at 19–20. When compared with each other, the fallacy in MCP's arguments becomes apparent. MCP would seek to delineate the "structural portion" of the "supporting . . . structure" from the "nonstructural" portion of the "supporting . . . structure."

If a "structure" is "supporting" something, then by definition it is performing a "structural" role. MCP's proposed distinction is facially untenable, relies on circular logic without clear distinctions, and introduces ambiguity that the jury will be unable to resolve. The Court should not leave the jury to guess at the boundaries and distinctions between these terms. *See O2 Micro*, 521 F.3d at 1362 (finding it improper to leave the jury to determine the meaning and legal significance of claim terms). Ravin's construction of stock, on the other hand, is fully consistent with only a portion of the stock being "structural" in nature, as the claims require. Accordingly, the Court should reject MCP's invitation to unnecessarily construe this term, and find the term "structural portion of the stock" requires no further construction.

## I.    "A compound archery bow" ('220 Patent)

MCP argues the term "[a] compound archery bow" is a non-limiting preamble, or alternatively, that the term should be construed as "an archery bow that utilizes a cam and cabling system." Dkt. 82 at 27–28. As Ravin lays out in its Brief (Dkt. 78 at 18–23), the preamble is limiting and as such, the claims of the '220 Patent should be limited to vertical archery bows only, and not crossbows. Accordingly, the Court should find the preamble limiting, and limit the claims of the '220 Patent to vertical compound archery bows.

"Whether to treat a preamble as a limitation is a determination 'resolved only on review of the entire[] . . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1367 (Fed. Cir. 2020) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Among other instances, a preamble may serve as a claim limitation (1) when the preamble "is 'necessary to give life, meaning, and vitality' to the claim[,]" (2) when limitations in the body of the claim depend "on a particular disputed preamble phrase for

antecedent basis," and (3) "[w]hen the preamble is essential to understand limitations or terms in the claim body." *Catalina Mktg.*, 289 F.3d at 808–09. MCP argues this claim term does not provide antecedent basis for any terms in the '220 Patent, was not added by amendment during prosecution, and is not necessary to give life, meaning, and vitality to any '220 Patent claims. However, a review of the entire '220 Patent and the claim language itself confirms MCP did not intend its claims of the '220 Patent to encompass crossbows.

The term "compound archery bow" *is* "necessary to give life, meaning, and vitality" to the claims, since the term "riser" has a specific meaning for vertical bows that does not apply to crossbows. Indeed, the inventors used the word "riser" only a single time in the '220 Specification, where it identifies "handle/riser 14." Dkt. 78, at 19. Everywhere else in the '220 Patent, reference numeral 14 is used to refer to a "handle." *Id*.



*Id.* at 19–20. Thus, in the '220 Patent, "riser" is synonymous with handle, and a person of ordinary skill would recognize that any enabling disclosure for the claimed "riser" is provided through reference to the "handle 14." Yet such disclosure is inapplicable to crossbows. On a crossbow, the riser is located at the front of the device where the limbs attach, while the handle is located below and rearward. *Id.* at 20. A user would not view the riser of the crossbow as a handle—to place your hand at the front would make the crossbow nearly impossible to hold and fire, while also placing your hand potentially in the line of fire of the arrow. *Id.*

Similarly, the '220 Patent confirms MCP's invention was limited to vertical compound archery bows. *Id.* at 21. The '220 Patent specification never describes a crossbow embodiment, and never even uses the word "crossbow" a single time. *Id.* Every discussion in the specification refers only to vertical bows. *Id.* Every Figure depicts a vertical bow. *Id.* Every example or description in the specification is specifically applicable to vertical bows. *Id.* For example, the '220 Patent explains that its hypothetical reference line drawn between the axles of the first and second rotatable members is "oriented vertically." *Id.* Yet, in a crossbow, the same line would be oriented *horizontally*—not vertically. *Id.* Indeed, this disclosure comes in the same description of "[c]ompound archery bows" MCP identifies as support for stretching the '220 Patent to cover crossbows. Specifically, MCP identifies the disclosure, "[c]ompound archery bows typically include a cam or pulley at the end of each limb." Dkt. 82 at 29. But MCP yet again takes this statement right out of context. That same paragraph identifies "a hypothetical line [] drawn between the axles [] would typically be oriented vertically." Dkt. 78, at 21. And that "[a]s the bow is drawn . . . the line would move in a rearward direction, ***away from the bow handle*** and toward the shooter." Dkt. 6-9, at 1:19-23. So, while the single sentence identified by MCP may be generally applicable to crossbows, the remaining description of "[c]ompound archery bows" from

the '220 Patent illustrates that the claimed invention is uniquely directed to vertical compound archery bows and not crossbows.

Furthermore, the inventors and drafters of the '220 Patent knew how to disclose and claim when an invention was equally applicable to crossbows, but chose not to do so in the '220 Patent. For example, U.S. Patent No. 8,616,189 titled "Flexible Cable Guard" has the same inventors (Mathews A. McPherson and Gary L. Simonds), was prosecuted by the same law firm (Vidas, Arrett & Steinkraus), and depicts only vertical archery bows in the Figures. Defendant's Additional Proposed Findings of Fact ("DASOF") ¶¶ 1–2. Yet, that patent explains "the present invention can be used with any suitable type of archery bow (including, but not limited to . . . crossbows, etc.)." DASOF ¶ 3. Similarly, U.S. Patent No. 8,448,630 titled "Archery Bow Limb Support" also has the same inventors and prosecuting law firm, depicts only vertical bows in the Figures, and states "the concept of a bow having deflected limb support can be used in any suitable type of bow, such as . . . crossbows, etc." DASOF ¶¶ 4–6. These patents were both filed before the '220 Patent was filed. But tellingly, no such disclosure appears in the '220 Patent, further evidencing that the inventors did not possess a crossbow as part of the '220 Patent's invention.

MCP's arguments regarding PTO search classifications are also inapposite. MCP argues that since the PTO searched related art fields during prosecution of the '220 Patent, the inventors must have possessed a crossbow as part of their invention disclosure. This argument is facially deficient. The face of the '220 Patent classifies the invention in International Class F41B 5/10 "Compound Bows." Dkt. 6-9 at (51). It does *not* also classify the invention in International Class F41B 5/12 "Crossbows." *Id*. Instead, MCP attempts to muddy the water by pointing out that the overarching subclass, F41B 5/00 "Bows; Crossbows" treats standard bows, recurve bows, compound bows, and crossbows as related technologies. No one disputes this. Instead, MCP

misleadingly argues that the USPTO instructs "[c]rossbows *with a particular shape of the bow itself* must be double classified in the crossbow group [] and in the respective group for the conventional, standalone bow shape, i.e. . . . . F41B 5/10 for compound crossbows." Dkt. 82, at 29. Ravin does not dispute that *compound* crossbows must be double classified into class F41B 5/10 "Compound Bows." What the PTO does not require, however, is the reverse: that compound bows be double classified in class 41B 5/12 "Crossbows." The fact that crossbows use elements of compound bows does not render every compound archery bow a crossbow, or even applicable to crossbow technologies. This is the classic "square versus rectangle" axiom. A *compound* crossbow may necessarily be a compound bow; a compound archery bow is *not* necessarily a crossbow— even under the PTO's classification structure. And similarly, the fact that an Examiner searched a related field (let alone one containing inventions that typically are being double-classified into the primary field to begin with) does not entitle an inventor to claim products that are not part of his specification and/or claims. The Patent Office does not write the claims and define the scope of the invention, the inventor does. For MCP to suggest that its patent should be broadened merely because of the Examiner's search strategy would render the specification and claims useless, a result the Court should avoid.

Accordingly, since the preamble is "necessary to give life, meaning, and vitality' to the claim," s*ee Catalina Mktg.*, 289 F.3d at 808–09, since the intrinsic record shows the claimed invention is limited to *vertical* compound archery bows, and since the inventors did not state the invention was applicable to crossbows as was their typical practice, the preamble is limiting. Thus, the '220 Patent encompasses only *vertical* compound archery bows, not crossbows.

### J.    "cable guard" ('220 Patent)

Ravin asserts that the plain and ordinary meaning of the term "cable guard" is sufficient.

45

Moreover, the term "cable guard" is not dispositive of any issue. Because the context of the '220 Patent makes clear the meaning of "cable guard" to a person of ordinary skill, the Court should find the term requires no further construction.

**K.   "said cable guard biasing the power cable in a lateral direction" ('220 Patent)**

MCP proposes plain and ordinary meaning for the remainder of the term following "cable guard." Ravin does not dispute this construction, and is not pursuing its indefiniteness theories with respect to this limitation. Accordingly, the Court should find this term requires no further construction.

**L.   "properly place a scope" ('435 Patent)**

Ravin is no longer advancing an indefiniteness theory for the phrase "properly place a scope." It is unclear what MCP's construction further adds when compared to the plain and ordinary meaning of the term "properly place a scope." Accordingly, the Court should find this term requires no further construction.

**M.   "said cheek rest comprising a peak" ('435 Patent)**

MCP proposes construing this term as "said cheek rest including a highest point." Dkt. 82 at 32. Ravin proposes the claim is sufficiently clear using its plain and ordinary meaning, and is not further pursuing its indefiniteness or specific construction theories with respect to this claim term. It is unclear what MCP's construction further adds when compared to the plain and ordinary meaning of the term "peak." Accordingly, the Court should find this term requires no further construction.

**III.   RAVIN HAS ESTABLISHED A GENUINE DISPUTE OF MATERIAL FACT REGARDING ITS INEQUITABLE CONDUCT ALLEGATIONS**

On March 13, 2023, the Court granted Ravin's motion to amend and allowed Ravin to introduce the claim of inequitable conduct against inventor Matt McPherson on the '435 Patent

into the case. Dkt. 61. MCP now seeks to remove that claim from the case raising the identical arguments it raised in the context of the motion to amend briefing rehashing and rearguing the same question about the location of the latch and the question of cumulativeness over the *Colley* reference. MCP presents no new evidence and there is no reason for the Court to grant its motion. Furthermore, MCP fails to introduce evidewnce from the one person who could answer why he hid the Stryker reference from the Patent Office—Matt McPherson. Absent from MCP's motion is any declaration or testimony or explanation from McPherson supporting its request for summary judgment. Because discovery is ongoing, including outstanding discovery requests to MCP, as well as depositions of McPherson and the individuals associated with the '435 prosecution, the Court should deny MCP's motion.

**A.      Summary Judgment Legal Standard**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court reviews motions for summary judgment "'construing all facts, and drawing all reasonable inferences from those facts, in favor of … the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Automobile Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

**B.      MCP's Distinction of the Location of the Latch Does Not Render Stryker Cumulative**

MCP's first argument is that the Stryker crossbows are irrelevant (and would not have led to the rejection of the '435 Patent application) because they place the cheek rest behind the cavity containing the latch. Dkt. 82, at 47. Ravin does not dispute this fact—the Stryker crossbows show

47

the cheek rest behind the latch. This dispute between the parties is addressed in Ravin's motion for summary judgment (Dkt. 78, at 25–31, 34–37) but will be addressed again briefly here to help the Court understand the context of this dispute.

Relevant to the latch limitation at issue, Claim 1 first requires "a latch configured to retain said string in a drawn condition." Dkt. 78, SOF ¶ 119. Further, Claim 1 also defines "an extension member positioned above said stock, the extension member comprising a cheek rest and a picatinny rail," and further recites that the claimed "cavity" is defined by "the extension member and stock." *Id*. In order to avoid both a finding of invalidity and a finding of inequitable conduct, MCP now argues the '435 Patent "specifically distinguished a configuration substantially identical to that represented by the various Stryker crossbows." Dkt. 82, at 48. In other words, MCP is now contending the reason the Stryker bows are different is that the latch must be under the cheek rest to meet the claims of the '435 Patent. Dkt. 78, SOF ¶¶ 128–139.

The problem with MCP's approach to the Stryker reference is that it is taking two inconsistent positions with validity and infringement because MCP wants to have its cake and eat it too. These two positions cannot be reconciled. In the first instance, MCP argues in its motion for summary judgment that the Stryker crossbow is not material (is not invalidating) because it "places the cheek rest *behind* the cavity containing the latch." Dkt. 82, at 47; *see also id.*, at 38 ("The plain and ordinary meaning of the language of claim 1 requires that, at least, the picatinny rail and cheek rest define the cavity (along with potentially other structures.")." MCP then distinguishes the Stryker by utilizing colored pictures to show how the latch of the Stryker is in the cavity that appears before the cheek rest:

48



Dkt. 82, at 49.

In the second instance, MCP ignores these arguments and accuses the Ravin R500, R26, and R29 of infringing claim 1 of the '435 Patent ***despite the fact that the latch is indisputably not positioned "beneath the cheek rest***." This is easily seen in the below annotated photos of each Accused Product showing the location of the cheek rest (circled in green), the latch (yellow line) and the termination point of the cheek rest (green line):



(R500)



(R26)



(R29)

Dkt. 79, SOF ¶¶ 242, 246, 250 (annotated). Further detail and pictures on this arrangement is found in Ravin's motion. Dkt. 78, at 28-32; Dkt. 79, SOF ¶¶ 243-252.

The tension between these two positions cannot be reconciled. That is why the Federal Circuit does not allow for such machinations with claim language between validity and infringement—"[i]t is axiomatic that claims are construed the same way for both invalidity and infringement." *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) (collecting cases). Thus, under MCP's contentions, if the cheek rest of the Accused Products is not over the latch, then it "lacks fundamental limitations" of the '435 Patent and Ravin's products ***cannot*** infringe under MCP's own broad construction, rendering the inequitable conduct question moot. This is the right answer and the proper outcome in this case—Ravin's products do not infringe for the same reasons that MCP has distinguished the Stryker crossbows. The Court should grant Ravin's motion for summary judgment of noninfringement and the dispute over the

51

'435 Patent will be resolved (e.g., MCP's motion on inequitable conduct can be denied as moot).[4] But, even if the Court were to deny Ravin's motion for noninfringement, that does not prove fatal to the Stryker crossbow. In this scenario a Patent Examiner would still have found the Stryker crossbows to be material and invalidating to the '435 Patent because an Examiner could have found MCP's distinction immaterial under a plain reading of the claims.

Limitation 1(g) of the '435 Patent is the "extension member" limitation. That claim requires an extension member "comprising a cheek rest and a picatinny rail." Dkt. 79, SOF ¶ 119. Then the claim tells us that a cavity is formed: "the extension member and the stock defining a cavity." *Id.* Finally, "the latch [is] positioned in the cavity." *Id.* Notably, in defining the term "extension member" the claim uses the word "comprising," which "is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *In re SP Controls, Inc.*, 453 F. App'x 990, 994 (Fed. Cir. 2011) In other words, "the term "comprising" is well understood to mean "including but not limited to." *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007). Thus, the extension member of the '435 Patent must include, but is not limited to, a cheek rest and a picatinny rail.

The claim then requires the extension member and stock to define a cavity. Applying the Federal Circuit's long-standing definition of "comprising," this means the cavity will be formed by a component that includes, but is not limited to, a cheek rest and picatinny rail. Because the word "comprising" is used, the claim is broadly written to encompass a scenario where some other component of the extension member is directly over the latch, so long as the cheek rest is still part of the extension member. This reading of the claims is confirmed by dependent claim 2, which

---

[4] As set forth in Ravin's Motion for Summary Judgment, the proper construction of the terms

requires "at least a portion of said cheek rest oriented over said latch." Dkt. 79, SOF ¶ 120. Under this interpretation, Stryker would anticipate claim 1 of the '435 Patent because its extension member "comprises" (includes, but is not limited to) the cheek rest and picatinny rail. Thus, in this scenario, the Examiner would have found MCP's distinction on the location of the latch to be irrelevant and would have found the Stryker crossbow to be material to patentability. *See* Dkt. 78, at 34-37 (explaining how the Stryker meets the limitations of the '435 Patent even under MCP's "latch" interpretation).

### C.     The Stryker Crossbow is not Cumulative of the Colley Reference

Raising the same arguments that previously were rejected by the Court, MCP again argues that Stryker is cumulative of the *Colley* reference. Before delving into the argument, the Court should understand the context in which the *Colley* reference appeared in the '435 Patent family.

First, *Colley* is one of over 100 references cited on the face of the '435 Patent. Dkt. 6-6, at (56). Second, the Colley reference was not discussed in any way by the Examiner during the prosecution of the '435 Patent. Doc. 55-8, Ex. H, pp. 669-880 (specific pages of the file history for the '435 Patent Application showing no discussion of *Colley*). Indeed, not a single mention was made by either MCP or the Examiner of the *Colley* reference prosecution of the '435 Patent. *Id*. MCP now engages in rampant speculation to say that the Examiner somehow considered, or would have remembered, or somehow distinguished, the *Colley* reference from among 100+ other references in the file history. At a minimum, this is a classic factual dispute that should not be resolved on summary judgment, especially when there is literally no substantive evaluation in the file history for the '435 Patent relating to *Colley*. Third, *Colley* only appeared in connection with a *different* patent in the '435 Patent family, which was granted _3 years before the '435 Patent was filed and issued_.  Dkt. 55-8, at pp. 91-93. Fourth, MCP brushes over the substantive differences

between the claims of the '013 Patent (which was the '774 Application) and the '435 Patent claiming they are simply "attorney argument." But these claims show substantive differences that render *Cooley* non-cumulative.

In response to a Final Rejection based on *Colley*, the Applicant (McPherson) added limitations to the '774 Application reciting "said extension member comprising a cheek rest, **at least a portion of said cheek rest oriented over said latch**." Dkt. 55-8, p. 126 (amendment to '774 Application claim 1). Eventually, the '774 Application issued as the '013 Patent with each of its independent claims including the limitation that at least a portion of the cheek rest is oriented over its latch, and the Examiner noted "the specific limitations of an <u>extension member extending over the latch comprising a cheek rest oriented over the latch</u>" as the reason for allowance for the '013 Patent. Dkt. 57, Ex. Y, '013 Patent 8:52–10:32 (as-granted claims); Doc. 55-8, p. 52 ('774 Application Examiner's reasons for allowance). As seen in the highlighted claim reproduced below, the independent claim of the '435 patent omits this distinguishing limitation that was added to the '013 Patent (formerly, the '774 Application). Instead, the '435 Patent claims something different—"an extension member positioned above said stock…comprising a cheek rest and a picatinny rail" with the "extension member and the stock defining a cavity, the latch positioned in the cavity."

The invention claimed is:
1. A crossbow comprising:
a stock;
a bow portion attached to the stock, the bow portion comprising at least one limb and a string;
a latch configured to retain said string in a drawn condition;
a trigger arranged to release said latch;
a handgrip in proximity to the trigger;
a butt located rearward of the latch, the butt spaced apart from the handgrip; and
an extension member positioned above said stock, the extension member comprising a cheek rest and a picatinny rail, a height of the cheek rest above the stock being less than a height of the picatinny rail above the stock, the cheek rest shaped differently from the picatinny rail, the extension member and the stock defining a cavity, the latch positioned in the cavity.

1. A crossbow comprising:
stock comprising a butt;
a bow portion comprising at least one limb and a string;
a riser attaching said bow portion to said stock;
a latch configured to retain said string in a drawn condition;
a trigger arranged to release said latch; and
an extension member extending over said latch, said extension member comprising a cheek rest, at least a portion of said cheek rest oriented over said latch;
wherein said latch is located in a first half of a distance from a rear end of said butt of said stock to said trigger;
in a ready-to-fire orientation, said string comprising a first location, a second location and a segment therebetween, said first location contacting a non-string portion of said bow portion, said second location contacting said latch, said segment defining a straight line extending from said first location to said second location.

Dkt. 79, SOF ¶ 119; *Brazen Dec.*, at Ex. G, at Claim 1. The difference between the claims of the '774 Application and the '435 Patent is meaningful in regard to *Colley*. To avoid *Colley*, the claims of the '774 Application were amended to require that the **cheek rest** is oriented over the latch, while the '435 requires that the **extension member, which *comprises* a cheek rest and picatinny rail** be oriented over the latch (by virtue of the extension member defining a cavity with the lower-positioned stock, the latch oriented in the cavity).

This means the '435 Patent more broadly includes embodiments where the cheek rest itself may not be oriented over the latch, so long as some portion of the extension member (e.g. the picatinny rail portion) is oriented over the latch.[5] This was not present in *Colley* as shown in MCP's own brief where the same physical structure of the cheek rest continues and extends over the latch as opposed to the picatinny rail:

---

[5] As noted above and in Ravin's Motion for Summary Judgment, MCP's contentions regarding the location of the latch and cheek rest for the '435 Patent should be accepted at face value and summary judgment of no infringement should be granted. If it is not, then this interpretation of the claims should apply.





Dkt. 82, at 49, 50.

And, as shown above, this is a significant distinction with Stryker where the cheek rest (as identified by MCP) does not extend over the latch. Because *Colley* discloses an embodiment where the cheek rest extends over the latch, it would not have been important to an examiner who was looking for art where the cheek rest *does not* extend over the latch (similar to Stryker). Thus, the Stryker crossbows presented a unique and different (i.e., non-cumulative) disclosure to Colley.

Instead of substantively addressing these arguments, MCP dispenses with them merely by suggesting they are "attorney argument." But this is insufficient to grant summary judgment. These arguments are based on the factual record of *Cooley*, the '435 Patent, and the '013 Patent. To the extent MCP disagrees with these interpretations, then that is a classic factual dispute that is not amenable for resolution at this stage.

Finally, MCP makes an argument that the Stryker is simply cumulative to a "standard crossbow" contained in the figures of the original provisional application. Dkt., 82, at 52. There is no expert testimony from either party on this "standard crossbow," MCP has not submitted any declaration or deposition from the original applicant of the '727 application (Paul Trpkovski), and MCP raises this argument for the first time in its summary judgment brief. From the single picture provided by MCP it is difficult to analyze the crossbow and make a comparison to the Stryker crossbow for purposes of cumulativeness. This is especially true because the original intent of the applicant for the '727 provisional application was to draw a distinction between the specific measurements of a standard crossbow and his bullpup crossbow. The larger picture from Figure 3.0 of the '727 provisional application makes this clear:



FIGURE 3.0

Dkt. 55-8, at MCP_017439. As the above picture makes clear, the original applicant was concerned with the specific dimensions of his crossbow as compared to the "standard crossbow," rather than drawing a parallel between the standard crossbow and the Stryker crossbow. Regardless, the evidentiary record is incomplete on this point and insufficient upon which to grant summary judgment. Discovery is ongoing and a deposition will be taken of Mr. Trpkovski, who can provide more detail on what, exactly, he was intending to depict in Figure 3 and whether he was attempting to line this Figure 3 "standard crossbow" up with the Stryker crossbow. Thus, this argument from MCP should be rejected.

### D.    There is Sufficient Evidence With the Likelihood of More Being Uncovered That McPherson Intended to Deceive the Patent Office by Withholding Key Stryker Prior Art to Advance and Secure His Position in the Marketplace

MCP's next argument on the inequitable conduct claim focuses on the question of whether McPherson intended to deceive the Patent Office by not disclosing the Stryker crossbow. Here, MCP focuses exclusively on the location of the latch and the question of cumulativeness. These

issues and fundamentally legal questions that have been addressed above and will not be re-addressed here. Though discovery is still in its infancy on this claim, Ravin has presented other, plausible inferences to be drawn from the evidence showing McPherson's intent to deceive.

As an initial matter, does not move for summary judgment challenging key pieces of evidence from Ravin regarding McPherson's inequitable conduct. First, MCP does not challenge that McPherson purchased three Stryker crossbows between 2008 and 2011 for his own personal testing. Dkt. 82, ¶¶ 302-306. Nor does MCP challenge that McPherson had a duty to disclose material prior art to the Patent Office. *Id.*, ¶¶ 316-323. MCP also does not dispute that the three Stryker crossbows owned by McPherson never were submitted to the Patent Office. *Id.*, ¶ 314. Finally, MCP does not challenge that McPherson runs MCP as the sole owner "without asking for permission" or "without having to get approval from others." *Id.*, ¶¶ 290-292. Shockingly, MCP does not submit a single declaration or piece of evidence from McPherson himself in support of its motion. Instead, it solely relies on legal arguments from its attorneys. The lack of any evidence from McPherson is telling.

As set forth by Ravin in its Amended Answer and Counterclaims, there is strong factual support showing that McPherson had a specific intent to deceive the Patent Office to obtain issuance of the '435 Patent. A few key points of this evidence are noted below, but are detailed in specificity with supporting documentation in Ravin's amended answer. Dkt. 82, at ¶¶ 409-456

- MCP's business was suffering in the leadup to 2012 because of its lack of a crossbow in the marketplace. At the same time, the crossbow market was exploding and presented a threat to McPherson's business. Dkt. 82, at ¶¶ 300-301; 409-418.

- Prior to September 2012, McPherson's companies did not make or sell a crossbow and McPherson's dealer network was placing huge pressure on him to develop and release

a crossbow. *Id.*, ¶¶ 418-424.

• McPherson's competitors was dominating the crossbow marketplace and MCP internally was concerned with a potential impact of losing the majority of shelf space with his dealers to make room for crossbows, a product McPherson did not have available until late 2012. *Id.*, 425-429; *Brazen Dec.*, Ex. F, at MCP_019563. As such, McPherson was leaving money on the table. Dkt. 63, at ¶ 438.

• McPherson has publicly stated he "waited a long time to build this crossbow. Maybe longer than we should have," and relied on help from his dealer network for building his first crossbow. *Id.*, ¶¶ 431-432.

• As of September 2012, McPherson did not own any patents covering a bullpup style crossbow or a crossbow with a "military aesthetic," which was the design/approach he wanted to use for his first crossbow. *Id.*, ¶¶ 445-447; Dkt. 87 (Ozanne Declaration failing to identify any bullpup or "military aesthetic" crossbow patents owned by McPherson prior to September 2012).

• This was why McPherson needed to purchase Trpkovski's patent application that matured into the '435 Patent—he didn't have similar patents of his own covering the same thing.

• If the Patent Office would have learned of the Stryker crossbows, it would not have issued the patents McPherson just paid for and that he planned to use to exclude competitors from offering similar bullpup, "military aesthetic" crossbows.

Ravin believes the threat to McPherson's business and the desire to compete quickly in an area he had never competed in led to McPherson's decision to withhold the Stryker crossbow from the Patent Office. Ravin believes these facts present McPherson's intent to deceive as the single

most reasonable inference to be drawn, not that McPherson conducted a review of 100+ patents in the prosecution of the '435 Patent and determined Stryker to be cumulative or inapplicable. MCP obviously disagrees and believes the legal arguments present a different story. Such opposing factual assertions are a classic example of a genuine dispute of material fact. The Court should deny summary judgment on the inequitable conduct claim on this basis alone. *See, e.g., Nat'l Prods., Inc. v. ProClip USA, Inc.* No. 20-cv-439-wmc, 2022 WL 2304114, *6 (W.D. Wis. June 27, 2022 ("A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party." (quoting *Anderson*, 477 U.S. at 248)).

Finally, summary judgment is not appropriate because this claim is still in its infancy. The amended answer with the inequitable conduct claim was only filed on March 13, 2023. Dkt. 63. Since that time, MCP has served discovery on MCP seeking information and answers on these very issues. *Brazen Dec.*, Ex. D. These sixteen RFPs seek documents that are central to Ravin's allegations and MCP has only begun to respond to these requests with a limited production of only 32 documents. *Brazen Dec.*, Ex. E. Less than half of this production relates to the inequitable conduct claim. The other half appears to relate to the purchase of the '435 Patent, which were documents that should have been produced some time ago in connection with proof of ownership of the '435 Patent. Nonetheless, Ravin believes additional documentation exists and is either being withheld or has not been produced yet. In addition, ESI discovery with specific email search protocols will be served soon and Ravin will then conduct a personal deposition of McPherson and a 30(b)(6) deposition of MCP. In other words, significant discovery into this claim and the reason for McPherson's decision to not disclose the Stryker crossbows remains.

In situations like this, the Seventh Circuit has cautioned that "summary judgment ought to be used sparingly and with great caution in cases . . . where subjective intent is a factor in the

determination." *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir. 1993). And the Supreme Court has likewise instructed that summary judgment is inappropriate unless the parties have had adequate time for discovery. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (interpreting Federal Rule of Civil Procedure 56 to allow denying a motion for summary judgment where the nonmoving party has not had an opportunity to make full discovery); *Anderson*, 477 U.S. at 250 n. 5 (same).[6] Accordingly, summary judgment for MCP is inappropriate because Ravin has alleged and is actively developing facts regarding Mathew McPherson's subjective intent to deceive the USPTO.

### E.    Conclusion

Overall, MCP admits it shoulders the burden for establishing the absence of a genuine dispute of material fact. *See* Dkt. 82 at 34 (quoting *Celotex*, 477 U.S. at 330, "The burden of establishing the nonexistence of a 'genuine dispute' is on the party moving for summary judgment."). Since there is a genuine dispute of material fact relating to Ravin's inequitable conduct allegations such that a reasonable jury could find in Ravin's favor, and since MCP has sought to establish the lack of a factual dispute by propounding competing facts, MCP has not carried that burden. Furthermore, since the door to in-depth discovery on Mathew McPherson's motivations in withholding the Stryker crossbows from the USPTO has only recently been opened, and since these allegations involve determinations of subjective intent, it would be improper for

---

[6] While these decisions rely on then-Rule 56(f), the current form of Rule 56 contains much the same language in subsection (d): "If a nonmovant shows . . . it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to . . . take discovery[.]"

the Court to grant MCP summary judgment at this early stage. *See id.* at 326; *Alexander*, 982 F.2d at 1160. Thus, the Court should deny MCP's Motion for Summary Judgment on Ravin's inequitable conduct allegations.

## IV.   RAVIN IS ENTITLED TO SUMMARY JUDGMENT OF NONINFRINGEMENT OF THE '433 AND '939 PATENTS

MCP moves for summary judgment of infringement of the '433 and '939 Patents by Ravin's R500/R500E crossbows. Not only should MCP's motion be denied, but the Court should find that Ravin does not infringe either the '433 or '939 Patents, as requested in Ravin's motion for summary judgment. Dkt. 78, at 46–49. The Court should grant Ravin's Motion, or in the alternative, deny MCP's summary judgment motion because Ravin has, at minimum, established a genuine dispute of material fact regarding the claim limitation "arranged to bias."

As discussed in detail in Ravin's Brief (Dkt. 78, at 37–49), Ravin's R500 and R500E crossbows (collectively referred to as the "R500"), the only products accused of infringing the '433 and '939 Patents, utilize a fundamentally different design than that depicted in the '433 Patent. Importantly, Ravin's R500 crossbows have power cables that extend from the cam (i.e., a rotatable member) to the limb, and not from cam to cam (i.e., from rotatable member to rotatable member). Dkt. 78, at 38–39, 46. Ravin's R500 is depicted below, with the power cables highlighted in red and blue.



*Id*. at 38. The R500's power cables, their cam tracks, and their mounting points on the limbs can

be seen in the image below:



Dkt. 78, at 39. The circled points are the power cable anchors for the cables attached to the cam

on the other side of the crossbow. The two cables extending off the right side of the image at an

angle between the circles are power cables originating at anchors on the opposing limb, and are

attached to the cam. *Id.* The cam tracks for the power cables can be seen in the image, with the

power cables just beginning to wrap into the track. *Id.* The bowstring is wrapped around the cam

in the center. *Id.* The bow is depicted in an undrawn or brace orientation.

      The power cables are a critical part of the crossbow. They transmit the power of the limbs

to the bowstring. As Ravin explains in its Brief (Dkt. 78 at 37–39), and as can be seen in the images

above, the R500's power cables extend from its cams to the limb on the opposite side of the crossbow. This is different from standard crossbows. In a typical crossbow, like those depicted in MCP's patents, the power cables extend from one cam to the other cam (i.e., they "extend between" the rotatable members). Dkt. 6-1, claim 1. This is what is depicted in every figure in the '433 and '939 Patents. For example, in Fig. 5, reproduced below, the power cables 34 and 36 connecting on the cam and extending toward the center of the bow:



FIG. 5

Dkt. 6-4, at Figure 5. Fig. 4 shows the power cables crossing the center of the bow and anchoring on the opposite cam:



FIG. 4

*Id*. at Figure 4. The orientation of a crossbow using this arrangement means that the power cables would naturally run in a straight line directly across the bow and across the path of the arrow. This is because the bowstring is also attached to the two cams and places the arrow in the same horizontal path as the power cables (if they are not moved out of the way), as can be seen in Fig. 2 (reproduced below).



FIG. 2

*Id*. at Figure 2. This is the purpose of the claimed invention, a cable positioner "arranged to" bias the cables away from the shooting axis and, thereby safely removing them from the path of the

67

arrow. As the '433 Patent explains, the purpose of the cable positioner is to hold the cables out of the path of the arrow as it is fired. "In some embodiments, a cable positioner 40 is positioned ***to allow for clearance of an arrow vane***. . . . [U]pon firing, the cable positioner 40 move[s] back toward the first position and desirably ***provide[s] clearance for the arrow vane***." *Id*. at 4:38–43 (emphasis added). The '433 Patent continues, "[i]n some embodiments, the vane of an arrow 56 will overlap a portion of the slot 50 and/or overlap a portion of the surface 52." *Id*. at 4:43–45.

As seen in Figures 2, 4, and 5 above, the '433 Patent is describing a dangerous situation in which the cocked bow moves the power cables move into the arrow's path of travel. This is where the cable positioner, "arranged to bias," serves its purpose. Because the cable positioner is located beneath the shooting axis it "biases" (pulls) the cables down from the shooting axis and away from the shooting axis, thus providing clearance for the travel of the arrow.

This is the invention of the '433 Patent family: to move the power cables out of the flight path during drawing, and to "bias" those cables out of the path of the arrow as it is fired. That is why the '433 Patent claims a cable positioner "arranged to bias," i.e., designed to move, the power cables out of the way of the arrow. And this "bias[ing]" language appears in every independent claim in both the '433 and '939 Patents, further evidencing that it is the primary inventive aspect of the alleged invention of the '433 Patent family—to physically move the power cables away from the flight path of the arrow because they would otherwise rest directly in that very same flight path. *That* is why, as Ravin discusses in its Brief (Dkt. 78 at 42), the term "arranged to" in the '433 Patent means "'made to,' 'designed to,' or 'configured to,'" requiring that an infringing cable positioner be "made to," "designed to," or "configured to" bias (move) the cables out of the way of a traveling arrow. Contrary to MCP's assertions (Dkt. 82 at 60–62, 68), Ravin is not trying to read in some amorphous intent requirement into patent law. Instead, Ravin simply applies the

proper, well-established construction of "arranged to" in combination with the disclosures in the specification to arrive at the proper conclusion that to infringe, the cable positioner must be "made to," "designed to," or "configured to" bias the cables in a direction lateral to the shooting axis.

Ravin's crossbows do not do so. Ravin's cable positioners are not "arranged to" bias the cables in a direction lateral to the shooting axis, because those cables do not—and never will—interfere with the flight path of the arrow. (Dkt. 78 at 37–49), This comes down to the unique and innovative arrangement of Ravin's power cables, wherein the cables extend from one cam to the outer edge of the opposite limb. This is shown, again, in the image below:



Dkt. 78, at 39. As can be seen, the power cables mount inches above (or below) the cams at the points circled in red. These anchors hold the power cables such that, in their natural state, they never cross through the shooting axis. This can be seen in the image below, where the R500 is in an undrawn state, and the power cables naturally cross above and below the shooting axis in much a straight line:



Dkt. 79, SOF ¶ 178. And the same holds true for the drawn orientation:



Dkt. 83, PSOF ¶ 356.

The image below also clearly depicts the power cables in a cocked (e.g. drawn) orientation:



Dkt. 83, PSOF ¶ 265. The natural arrangement of the cables in the Ravin crossbows, from upper

cam to lower limb (and vice versa) moves the cables out of the path of the arrow. Thus, there is no

need to bias the cables and, indeed, this is why there is no biasing of the cables as required in

MCP's patents. In other words, the R500's cable positioner is not *designed to* hold those cables

out of the path of an arrow because the unique arrangement of the cables already does so. Even if

MCP were to identify any alleged deflection of the power cables in Ravin's cables, it is, at best,

incidental and irrelevant since the cable positioner is not "arranged to," i.e., specifically "designed to," bias those cables out of the way. Accordingly, the Court should grant Ravin summary judgment of noninfringement with respect to all asserted claims in the '433 and '939 Patents, or at minimum, should find that Ravin has established a genuine dispute of material fact and deny MCP summary judgment of infringement of the '433 and '939 Patents.

## V.   SUMMARY JUDGMENT IS INAPPROPRIATE ON THE HIGHLY FACTUAL INQUIRY OF OBVIOUSNESS AND MOTIVATION TO COMBINE FOR THE '433 AND '939 PATENTS

On the '433 and '939 Patents, Ravin has presented arguments that both patents are invalid as obvious. Ravin presented two different theories for its obviousness argument. First, Ravin argues that for claim 1(e), it would have been obvious for a person of ordinary skill to modify *Bednar* such that the slot in which the cables travel would be non-parallel instead of parallel. Second, Ravin argues that a person of ordinary skill also could have combined *Bednar* with the non parallel slot for the cables in *Kang* to arrive at limitation 1(e) for the '433 Patent and 1(d) for the '939 Patent. In both instances, Ravin expressly notes that the result of the modification/combination would be a non-parallel travel path for the cables. SOF XX, ¶¶ 275, 310.

As an initial matter, MCP argues that the *Bednar-6311* and *Kang* references, whether alone or combined, fail to show any cable positioner that moves along a path that is non-prallel to the shooting axis of the crossbow. Dkt. 82, at 75. This is simply incorrect and easily disproven by the expert report itself:

- ¶ 275 -- "a POSITA would have found it obvious to modify the crossbow to provide a non-parallel slot (and thus a non-parallel shooting axis)…" Dkt. 84-22, at ¶ 275.

- ¶ 310 -- "Though in *Bednar* slot 44 is parallel to the shooting axis of the crossbow, a POSITA would have found it obvious to modify the crossbow to provide a non-

parallel slot …" *Id*. at ¶ 310.

Thus, to the extent MCP is suggesting that Ravin's expert did not provide a combination/modification that resulted in a non-parallel travel path, it is wrong. Ravin's expert did precisely that in his proposed combination.

Next, MCP challenges the combination/modification by suggesting the combination fails to sufficiently show a motivation to combine, and that the combination is the result of impermissible hindsight. MCP's motion is misplaced. It may disagree with the conclusion reached by Ravin, but summary judgment is inappropriate for one of the most intensive factual inquiries in a patent case.

As the Federal Circuit has repeatedly held, the question of obviousness and motivation to combine is a heavily factual inquiry. *Apple Inc. v. Samsung Elecs. Co*., 839 F.3d 1034, 1047–48, 1051 (Fed. Cir. 2016) (*en banc).* Indeed, "whether there was sufficient motivation to combine the references" is a "factual issue." *Wyers v. Master Lock Co.*, 616 FG.3d 1231, 1237 (Fed. Cir. 2010). And it is black letter law that while obviousness is a question of law, "that determination is based on underlying factual findings." *In re Nuvasiv, Inc.,* 842 F.3d 1376, 1381-82 (Fed. Cir. 2016) *Apple Inc. v. Andrea Elecs. Corp*., 949 F.3d 697, 710 (Fed. Cir. 2020) (noting the motivation to combine inquiry is a "fact-intensive inquiry").

On this question, Ravin's expert provided 16 paragraphs of opinion providing the basis for the obviousness combination, the details on the motivation to combine, and why a person of ordinary skill in the art would be motivated to combine these references (or modify *Bednar*). Dkt. 84-22, at ¶¶ 273-279, 309-317. In these paragraphs he discusses the strain on the crossbow, how it makes the bow easier to use when inserting the slide, how it increases the lifespan of the bow, and reduces chances for catastrophic failure, along with many other reasons. In support of its argument, MCP cites a declaration from its own expert who, not surprisingly, disagrees with

Ravin's expert. This is nothing more than a classic disagreement on facts. There is nothing "undisputed" about two experts who disagree. This is the quintessential jury question and summary judgment should be denied.

## VI.   RAVIN HAS ESTABLISHED MCP'S IDENTIFIED PATENTS ARE INVALID UNDER 35 U.S.C. § 112

MCP moves for summary judgment regarding Ravin's allegations surrounding seven claim terms being indefinite, and regarding Ravin's allegations that two further claim terms lack written description support and/or are not enabled by their respective specifications. As noted above, Ravin is pursuing only a limited subset of these identified terms. The terms Ravin still pursues are identified below.

### A.   "stock"

MCP moves for summary judgment that the claim term "stock," as used across the '375, '757, '665, '433, '939, '893, '056, and '435 Patents, is not indefinite. MCP suggests Ravin's argument is "absurd" because "[e]very crossbow has a stock." Dkt. 82 at 78–79. This misses the problem entirely. Ravin does not dispute that crossbows have stocks. Instead, Ravin argues that MCP's inconsistent application and identification of the components it contends are the "stock" is what leads to indefiniteness. If the Court adopts Ravin's claim construction and the term "stock" is applied similarly and properly across all patents, then the indefiniteness issue should be resolved. However, if MCP is not so limited and continues to inconsistently apply "stock" across the patents, then Ravin should not be precluded from offering indefiniteness arguments to the jury.

As discussed above, it is MCP's claim construction and its inconsistent application of that construction that renders the claim term indefinite. As MCP admits in its legal standard, a claim is indefinite when "it fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). MCP's

construction of "stock" is a classic example of MCP "fail[ing] to inform, with reasonable certainty, those skilled in the art about the scope of the invention" because MCP's overbroad construction can apply to any number of crossbow components. *Id.* Indeed, MCP's own assertions throughout this lawsuit betray the fact that MCP does not consistently identify the "stock" of the Accused Products. For example, in its infringement contentions, with reference to the '665 Patent, MCP identifies reference numeral 2 as the "stock":



*See, e.g.*, Dkt. 86-1, at 105. Yet, with respect to the '056 Patent, MCP identifies a separate component (which Ravin refers to as the "finger guard") as the "stock" (reference numeral 2):



*Id*. at 225. This fingerguard is the component that sits above the railing that holds the arrow and is attached to the stock itself with screws/bolts. Its purpose is to keep the user's fingers out of the path of the arrow, not to provide any structural support. Yet MCP identifies it as part of the stock. MCP's expert, David Paulus, similarly interchangeably identifies separate (and often inconsistent) components as the "stock" depending on the patent. For example, with reference to the '435 Patent, Dr. Paulus identifies the lower rear portion of the R500 as the "stock":



*Id*. at 277 (again using numeral 2 to identify the stock). Yet, with respect to the '893 Patent, Dr.

Paulus also identifies the finger guard, and not the previous numeral 2 component identified

immediately above, as the "stock" (reference numeral 11):



*Id*. at 201. These are the inconsistencies that give rise to Ravin's indefiniteness arguments.

A patentee's inconsistent statements about the meaning of a term may evidence and

contribute to a "zone of uncertainty," rendering the claims indefinite. *Infinity Computer Prods., Inc. v. Oki Data Ams., Inc.*, 987 F.3d 1053, 1060 (Fed. Cir. 2021). Based on MCP's shifting positions on what constitutes the "stock" of the identified crossbows throughout its pleadings, contentions, and expert reports, it is impossible for the Court, the parties, the public, one of ordinary skill in the art, and, most importantly, the jury to determine the meaning of this term, let alone whether the patents using the term are infringed. MCP's conflicting statements "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 910. If MCP continues to advance conflicting theories about what is, and is not, the stock between the patents, a person of ordinary skill in the art cannot discern the meaning of "stock" as it relates to the Accused Products. And the jury should have the opportunity to hear this evidence and hold MCP accountable for the games it is playing with the term "stock." As such, Ravin should not be precluded from proffering indefiniteness arguments to the jury in such case.

**B.      "properly place a scope" ('435 Patent)**

As stated above, Ravin is no longer pursuing an indefiniteness theory with respect to this term.

**C.      "said cheek rest comprising a peak" ('435 Patent)**

As stated above, Ravin is no longer pursuing an indefiniteness theory with respect to this term.

**D.      "said cable guard biasing said power cable in a lateral direction" ('220 Patent)**

As stated above, Ravin is no longer pursuing an indefiniteness theory with respect to this term.

80

E.    **"said cable separated from said shooting axis by a shortest distance as measured perpendicular to the shooting axis . . . the shortest distance being greater in the first draw orientation than in the second draw orientation" ('939 Patent, Claims 1 & 11)**

MCP spends almost three pages discussing how the cables move as the crossbow described in the '939 Patent is drawn. *See* Dkt. 82 at 82–84. Yet, none of this description points to anything beyond the challenged claim language itself for determining how to measure the "shortest distance." *Id.* Instead, it relies on attorney argument that "every draw position . . . will have a 'shortest distance' as measured perpendicular from the cable to the shooting axis." *Id.* at 84. As Ravin presents in its Brief (Dkt. 78 at 47–49), this term is indefinite, and the Court should grant Ravin summary judgment confirming as much.

At first glance, the claims appear clear and MCP's arguments seem reasonable. The claims recite how to determine what the claimed "shortest distance" is: the "shortest distance" is the measure of separation between the claimed cable and shooting axis, as measured perpendicular to the shooting axis. Dkt. 78, at 47–48. The claims then rely on this "shortest distance" as the antecedent basis to require that specific measurement for the remainder of the claim. *Id.* But it is this purported clarity that elucidates the issue.

As the claim language demonstrates, the claims are directed to a crossbow comprising, among other things, a "cable" that is "separated from said shooting axis by a shortest distance as measured perpendicular to the shooting axis." *Id.* The claimed crossbow also has "a first draw orientation" and a "second draw orientation" where "the shortest distance" is "greater in the first draw orientation than in the second draw orientation." Ravin does not disagree that the claims recite these aspects. But already there is an issue of ambiguity: where does one measure the "shortest distance"? *Id.* The claims do not recite "a *first* shortest distance" or a "*second* shortest distance." Instead, they recite only "**a** shortest distance," then "**the** shortest distance." The Federal

Circuit has held that, generally, a "single claim term should be construed consistently with its appearance in other places in the same claim or in the other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). "Furthermore, where, as here, a claim term first appears with the indefinite article 'a' and later appears with a definite article, such as 'the,' the Federal Circuit has found that the terms share an 'antecedent basis' relationship and apply an 'initial presumption' that the latter occurrence carries the same meaning as the former." *X One, Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1035 (N.D. Cal. 2020) (citing *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). Thus, the claim refers to a single "shortest distance," and is not referring to multiple "shortest distances" as MCP appears to implicitly argue.

And this gives rise to numerous unanswerable questions. For example, is the "shortest distance" measured in the first draw orientation or the second? Dkt. 78, at 47–48. The claims do not say. How can *the* "shortest distance" be "greater" in the first draw orientation than the second draw orientation? *Id*. If the distance is greater in the second orientation, does it not cease to be a "shortest distance"? *Id*. Two different distances are referenced in the specification, one in the brace orientation and one in the cocked orientation. *Id*. These distances are described as being different from one another. Yet the '939 Patent simply states *the* distance is, desirably, the "shortest."

Since the poor drafting of Claims 1 and 11 of the '939 Patent make it impossible for a POSITA to ascertain the scope of the claims with reasonable certainty, Ravin is entitled to summary judgment that Claims 1 and 11 are invalid as indefinite. *Id*.

### F.   "said guide member comprises a channel, said second cable positioned in said channel" ('665 Patent)

In view of MCP's filing of a certificate of correction for the '665 Patent, Ravin is no longer pursuing an indefiniteness theory with respect to this term.

G.    "the riser defining a predetermined location" ('220 Patent)

MCP argues the limitation "the riser defining a predetermined location" is not indefinite because '220 Patent Figures 1–4 depict a predetermined location 30. Dkt. 82 at 90. MCP further argues the "'predetermined location 30' can be any point on the riser through which a reference line *a* may pass through." *Id.* MCP elaborates that "[t]he important thing . . . is that it be predetermined." *Id.* Yet, this demonstrates the issue. *How* is the "predetermined location" predetermined? The '220 Patent gives no guidance on predetermining a "predetermined location."

And to the extent the '220 Patent is definite as applied to vertical compound archery bows, it is indefinite when applied to crossbows because, as noted above, the '220 Patent is utterly silent concerning crossbows. The only examples the '220 Patent provides for "predetermined location[s]" are inapplicable to crossbows, as discussed above in Section III.I, since the handle and riser are separate components on a crossbow. For example, the '220 Patent suggests "the predetermined location 30 comprises a pivot point 31 of the grip." Dkt.6-9, at 2:64–65. Crossbows do not have a "pivot point" of the grip, since crossbows are not operated like vertical compound bows, wherein the archer holds the bow loosely and allows it to pivot freely as the arrow is loosed. The '220 Patent also suggests "the predetermined location 30 comprises an accessory mount location, such as an arrow rest mount location." Dkt.6-9, at 2:66–67. Crossbows, again, do not typically have arrow rests, since the crossbow bolt (arrow) rides along a rail. Accordingly, since the '220 Patent provides no guidance for predetermining "a predetermined location," the term "the riser defining a predetermined location" is invalid as indefinite. Furthermore, to the extent the language of the claim and lack of guidance, alone, does not render the claim indefinite, its application to crossbows renders the term indefinite, since there is less yet guidance on how to determine a "predetermined location" on a crossbow. Accordingly, the Court should deny MCP

83

summary judgment that this limitation is definite, and should permit Ravin to present its indefiniteness arguments to the jury.

### H.    "A compound archery bow" ('220 Patent) (Written Description)

MCP's entire argument rests on the assertion that the preamble, "[a] compound archery bow," is not a claim limitation. For the reasons discussed above and in Ravin's Brief (Dkt. 78 at 18–21), the preamble to claims 1 and 10 of the '220 Patent is limiting because it is "necessary to give life, meaning, and vitality" to the claims and is "essential to understand limitations or terms in the claim body." *Catalina Mktg.*, 289 F.3d at 808–09. Furthermore, in the event that the Court finds the preamble to be non-limiting, the '220 Patent lacks written description support as applied to crossbows, and accordingly the Court must find the Asserted Claims of the '220 Patent invalid for lack of written description support.

To meet the written description standard of 35 U.S.C. § 112, ¶ 1, "[t]he disclosure must 'reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date,'" where "[p]osession means 'possession as shown in the disclosure' and 'requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.'" *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011) (quoting *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). As the Supreme Court has enunciated, "[w]hat is claimed by the patent application must be the same as what is disclosed in the specification; otherwise the patent should not issue." *Festo Corp. v. Shoketsu Kinzoku Kabushiki Co.*, 535 U.S. 722, 736 (2002). "The written description is the technologic disclosure of the invention. It serves the fundamental purpose of making known what has been invented, ***including any variations contemplated by the inventor***." *Space Systems/Loral, Inc. v. Lockeed*

*Martin Corp.*, 405 F.3d 985, 987 (Fed. Cir. 2005 (emphasis added). "[T]he patent monopoly does not extend beyond the invention described and explained as the statute requires . . . it cannot be enlarged by claims in the patent not supported by the description." *Schriber-Schroth Co. v. Cleveland Trust Co.* 305 U.S. 47, 57 (1938).

If the Court determines the claims of the '220 Patent are broad enough to include crossbow embodiments, the '220 Patent fails to meet this standard, and the Court should invalidate the claims of the '220 Patent for lack of written description support.

As discussed above in Section III.I, the intrinsic evidence leaves no dispute that the '220 Patent specification fails to "describe and explain" the invention as it applies to crossbows. *See Schriber-Schroth*, 305 U.S. at 57. For example, the title of the '220 Patent is "Archery Bow," and the Figures exclusively depict a *vertical* compound archery bow. Dkt. 78, at 21. The Detailed Description exclusively and repeatedly describes the alleged invention as an "archery bow" or just "bow" when discussing the various embodiments of the *vertical* bow shown in the Figures. *Id*. Indeed, the '220 Patent never uses the word "crossbow" a single time in its disclosure. *Id*. In sum, nothing in the '220 Patent supports MCP's contention that the disclosure "reasonably conveys to those skilled in the art that the inventor had possession of [a crossbow embodiment] as of the filing date." *See Crown Packaging*, 635 F.3d at 1380.

Furthermore, as discussed above in Section III.I, the written description in the '220 Patent only makes sense in the context of exclusively *vertical* compound archery bows. For example, the term "riser" as used in the '220 Patent refers to, or at least includes, the handle of the bow. There is not dispute that the handle of a crossbow is not the same as the crossbow's "riser." Dkt. 78, at 20. Similarly, discussing hypothetical reference line drawn between the axles of the first and second rotatable members, the '220 Patent explains such a "line would typically be oriented

vertically." *Id*. at 21. But in a crossbow, there is no dispute the same line would be oriented *horizontally*. Since the intrinsic evidence only describes a *vertical* compound archery bow, and since the disclosures only make sense in the context of a *vertical* compound archery bow, there is no genuine dispute that the inventor only invented and possessed a *vertical* compound archery bow. *See Rivera v. ITC*, 857 F.3d 1315, 1321 (Fed. Cir. 2017) (affirming determination of no written description support for a broad interpretation of the claims where the patent "consistently describe[d] an invention" that was narrower than the broad interpretation advanced); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998) (reversing summary judgment that claim was not invalid for lack of written description support where the sought claim scope applied to sofas with reclining controls anywhere on the sofa, but the disclosure disclosed only controls located on the console). Accordingly, the Court should grant Ravin summary judgment, finding the '220 Patent claims invalid as applied for lack of written description support.

I.   **"the first rotatable member overlaps with the structural portion of the stock and a portion of the first rotatable member passes through a sidewall of the stock" ('893 Patent)**

MCP attempts to dodge Ravin's arguments by framing this dispute as a claim construction issue, while tacitly admitting that the '893 Patent specification lacks written description support for the claims as written. Accordingly, for this reason and the reasons stated in Ravin's Brief (Dkt. 78 at 49–54), the Court should find claims 1 and 11 of the '893 Patent and claim 1 of the '056 Patent invalid for lack of written description support, and should further grant Ravin's Motion for Summary Judgment of Noninfringement of the '893 Patent Family.

MCP attempts to frame Ravin's arguments as improper claim construction arguments, but this is simply not the case. Ravin did not raise this term as needing construction, since the term is clear on its face as to what is required. And despite its protests, MCP apparently did not disagree

because MCP cites Ravin's invalidity contentions, served August 2, 2022, as proof of Ravin's anticipated arguments. Yet MCP did not propose this claim term as needing construction when the parties exchanged claim terms on August 12, 2022, or before the parties jointly submitted terms requiring construction on March 13, 2023 (Dkt. 62-1). MCP does not propose a specific construction for this term. Instead, it appears to only take issue with the fact that Ravin did not list this term as requiring further construction in the parties' list of terms. With the plain and ordinary meaning of the claim term being clear, Ravin did not anticipate the need for further construction, and did not see the need to ask the Court to further construe the term. *See O2 Micro*, 521 F.3d at 1360 ("Words of a claim are generally given their ordinary and customary meaning . . .").

However, in certain cases such as this, the parties' dispute has apparently "evolve[d] to a point where they realize that a further construction is necessary." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014. "[W]hen a determinative claim construction dispute arises, a district court must resolve it." *TNS Media Rsch., LLC v. TiVo Rsch. & Analytics, Inc.*, 629 F. App'x 916, 938 (Fed. Cir. 2015) (citing *O2 Micro*, 521 F.3d at 1360). Accordingly, since MCP is implicitly seeking the Court to resolve the claim construction dispute, Ravin asserts that the plain and ordinary meaning of the claim term is sufficiently clear to a person of ordinary skill in the art, and requires no further construction.

The words of the claim are clear: one instance states "***the first rotatable member*** overlaps," while the second states "***a portion of*** the first rotatable member passes through." Dkt. 78, at 50–51 (emphasis added). A Court "must give each claim term the respect that it is due." *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005; *see Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning *to all the terms* of the claim is preferred over one that does not do so." (emphasis added)); *SSI Techs., LLC*

*v. Dongguan Zhenyang Elec. Mech. LTD.*, 59 F.4th 1328, 1334–35 (Fed. Cir. 2023 (rejecting a construction of the term "measured volume" which rendered the word "measured" "superfluous, as the word 'volume' alone would be sufficient to give the claim the scope that [defendant] proposes").

The plain language of the claim limitation demonstrates that the drafter drew a distinction between the entire rotatable member and "a portion of" that rotatable member. MCP's construction, on the other hand, would fail to "give[] meaning to all the terms of the claim." *See Merck*, 395 F.3d at 1372. Indeed, MCP's construction would render the term "a portion of" superfluous, since the term "the first rotatable member" would encompass "portion[s] of" that rotatable member. *See SSI Techs.*, 59 F.4th at 1334–35. Such a construction is legally improper. Because the patentee chose to distinguish between "the first rotatable member" and "*a portion of* the first rotatable member", the express language of the claims requires that *the entire* rotatable member overlap with the structural portion of the stock. *See Convolve, Inc. v. Compaq Comput. Corp.*, 812 F.3d 1313, 1318 (Fed. Cir. 2016 (affirming district court's construction of "user interface" as "the site at which a user actually selects an operating more" because "[t]he claim term is 'user interface,' not just 'interface.' The word 'user' therefore must distinguish between kinds of interfaces").

Ravin's construction—not MCP's—"give[s] each claim term the respect that it is due," as the Federal Circuit mandates. *See Pause Tech.*, 419 F.3d at 1334. While MCP may not like the proper construction, and may even have not intended to draft the claims in this way, the language of the claims controls nonetheless. *See Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001 ("claims can only be construed to preserve their validity where the proposed claim construction . . . ***does not revise or ignore the explicit language of the claims***"

(emphasis added)); *Chef Am.*, 358 F.3d at 1373 (refusing to correct a draftsman's mistake by construing "to" as "at" in a patent for baking bread "to a temperature in the range of 400°F to 850°F" versus "at" the stated temperatures, even though the claims as written could not perform the function the patentees intended, since the language of the claims were "unambiguous"). Accordingly, the Court should recognize that, under the plain language of the claim, to give all terms the meaning and respect they are due, "the first rotatable member" refers to the entire first rotatable member, and "a portion of the first rotatable member" refers to a portion of the first rotatable member less than the whole. Therefore, the claim term requires no further construction, since even Ravin's clarification provides little to nothing more than the language of the claim itself already provides.

With any possible claim construction dispute out of the way, MCP is left standing bare in its position. Throughout its argument, it admits the claim term lacks written description support. For example, MCP admits "[n]othing in the '893 Patent drawings, specification or claims remotely suggests" or in other words, "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Crown Packaging*, 635 F.3d at 1380. Since the '893 Patent lacks written description support for the proper interpretation of claims 1 and 11 of the '893 Patent and claim 1 of the '056 Patent, the Court should grant Ravin summary judgment that those claims are invalid under 35 U.S.C. § 112, ¶ 1.

## VII.   MOTION TO STRIKE

MCP moves to strike portions of Ravin's expert reports. MCP argues Ravin failed to disclose certain non-infringing alternatives/design-arounds through its interrogatory responses prior to including the same in its expert reports, and that such alleged failure warrants striking the related portions of Ravin's expert reports. Both the balance of the factors and the facts of MCP's

own cited case law demonstrate the facts of this case warrant denying MCP's motion.

As MCP points out, the Seventh Circuit has laid out four factors for courts to consider when determining whether to exclude evidence under Rule 37: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 417 (7th Cir. 2019 (citation omitted). However, MCP's Brief seemingly only addresses factor (1), alleging that MCP will suffer some prejudice if the Court does not strike portions of Ravin's expert reports. But this is not the case. And in any event, the remaining factors weigh in favor of denying MCP's motion.

MCP argues it suffered "great" prejudice in the form of relying on Ravin's "promise" to supplement its response to MCP's Interrogatory No. 6 should Ravin uncover any design-arounds through the course of discovery. MCP argues that this prejudice materialized in the form of its experts not having an opportunity to opine on Ravin's proposed design arounds. Yet any potential prejudice MCP may have suffered is only slight, since MCP has ample remaining opportunity to cure such prejudice. Indeed, MCP has yet to notice a 30(b)(6) deposition on Ravin, and has not deposed either Ravin expert mentioned in its Motion. Discovery does not close in this case until August 18, and trial is not scheduled until October 16, more than five months away. Dkt. 28 at 6, 9. Thus, MCP has plenty of time to depose both Ravin's experts and any fact witnesses those experts spoke to regarding the identified design-arounds. Similarly, MCP has ample time to prepare to test Ravin's theories through cross examination at trial.

Furthermore, MCP complains that it suffered prejudice since the scheduling order in this case does not include rebuttal reports. Yet, MCP has made no attempt to seek to supplement its

expert report regarding this topic, and has not discussed the same with Ravin. Instead, MCP's complaints of prejudice fundamentally address a different issue—Ravin's designs show that the asserted patents are easy to avoid and essentially worthless from a damages perspective. MCP would prefer to see this testimony stricken from the case because this is evidence it does not want the jury to hear. *See, e.g., AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) ("When an infringer can easily design around a patent replacing its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low."). MCP's strategic desires do not legitimize its concerns in light of its numerous remaining opportunities to cure any prejudice through investigating and testing Ravin's theories in deposition and throughout the remainder of fact discovery. Perhaps this is why MCP originally proposed a schedule that allowed for expert reports in the middle of discovery and provided for 5+ months of discovery to challenge expert opinions. Regardless, MCP's concerns are overwrought and should be addressed through vigorous cross-examination and further discovery. Accordingly, the first two factors weigh in Ravin's favor. Furthermore, as noted, the trial is still over five months away, and as such, there is no likelihood of disruption of the trial. Accordingly, factor three also weighs in Ravin's favor.

The final factor likewise weighs in Ravin's favor. Simply put, the challenged design-arounds did not exist at the time MCP served its opening expert reports. Upon seeing MCP's factual contentions for why there is infringement, Ravin's technical expert, Dirk Duffner, worked with Ravin's attorneys and Ravin's engineers to propose and design non-infringing alternatives. Thus, at the time MCP served its opening expert reports, as MCP admits in its Brief, Ravin had provided its then-existing design-arounds. Since the proposed design-arounds did not exist at the

time, there was no intentional withholding or bad faith on Ravin's part in not disclosing the same.[7] It was only after MCP disclosed its expert's theories that the design arounds materialized. Accordingly, the fourth factor weighs in Ravin's favor, and against striking Ravin's expert reports as they relate to the challenged design-arounds.

MCP's cited case law also demonstrates the instant facts do not warrant striking any portions of Ravin's expert reports. For example, in *MLC Intellectual Property, LLC v. Micron Technology, Inc.*, the dispute surrounded expert testimony relating to established royalty rates. 10 F.4th 1358, 1370 (Fed. Cir. 2021). The district court struck certain expert testimony because it directly conflicted with the nonmovant's 30(b)(6) witness testimony indicating the nonmovant "did not know the royalty rate" in certain license agreements. *Id.* The Federal Circuit upheld the decision in light of this directly contradictory testimony, further reasoning that "had [the nonmovant] disclosed this information, [the movant] could have sought fact discovery regarding this contention." *Id.* at 1371. Finally, the Federal Circuit noted the nonmovant was in the nonmovant's possession from the outset of the case and had been produced before making the 30(b)(6) representations. *Id.* The facts here are entirely different. As explained above, Ravin's design-arounds did not exist at the outset of the case. Ravin did not make any representations to

---

[7] MCP again attempts to paint Ravin as a bad actor in discovery by alleging Ravin has not complied with the Court's Order (Dkts. 58, 60) to produce the R500 CAD files. The parties have since determined that there were technical issues with Ravin's production of those CAD files in September 2022. *See Brazen Dec.*, Ex. C. Both parties have accepted their respective responsibility in the misunderstanding, and Ravin presumes MCP withdraws its allegations based on MCP's latest communications with Ravin. *Id*.

MCP that no such design arounds could exist, and indeed disclosed other design-arounds as Ravin developed them. Furthermore, discovery is still open, and MCP has yet to notice a 30(b)(6) deposition, or take an individual fact depositions of Ravin's employees responsible for bow design. And while MCP originally had scheduled a deposition of Ravin's experts prior to the summary judgment opposition brief deadline, it canceled those depositions and has not rescheduled them. *Brazen Dec.*, Ex. C. Thus, as of the time of this brief, MCP has not conducted a single bit of deposition "fact discovery regarding [Ravin's] contention[s]." *See MLC*, 10 F.4th at 1371.

Similarly, in *David v. Caterpillar, Inc.*, the Seventh Circuit affirmed the district court's decision to allow a witness to testify where the nonmovant failed to update her Rule 26(a)(1) disclosures to identify the witness, did not supplement her interrogatories to identify the witness, and where the movant learned of the witness's alleged statements only days before trial. 324 F.3d 851, 857 (7th Cir. 2003). Specifically, the Court found no prejudice to the movant since the movant had interviewed the witness previously and learned of the subject of his testimony prior to trial and submitted evidence directly rebutting the witness's testimony. *Id.* Here, again, MCP has ample opportunity to interview Ravin's witnesses (i.e., Drs. Kindler and Duffner and/or Ravin via 30(b)(6)) and time to develop theories or introduce evidence directly rebutting Ravin's assertions. Moreover, should MCP discover evidence upon which it needs to supplement its expert reports, it may do so as allowed by requesting leave of the Court, as expressly described in the Scheduling Order. *See* Dkt. 28, at 4.

Finally, MCP points to an unpublished example from the Eastern District of Texas, *Better Mouse Co. v. SteelSeries Aps*, No. 2:14-cv-198-RSP, 2016 WL 7665908, *2 (Jan. 7, 2016 E.D. Tex.) Yet here again, while the Court did exclude a party's proposed design-arounds, the basis of the court's decision lied in the nonmovant's interrogatory response stating that because the

"accused products do not practice the claims of the '200 Patent, at least because any resolution change is affected by the software driver on the computer to which the mouse is connected, **no such modifications are relevant or necessary**." *Id.* (emphasis in original). I.e., the nonmovant made direct, unequivocal assertions that it would not rely on the specific design arounds. Here, both Ravin's interrogatory response and its previous actions stand in stark contrast. Ravin responded that it would supplement its response "should such design arounds come to light throughout the course of discovery," expressly leaving the door open to the possibility of relying on proposed design-arounds. And discovery is still open for MCP to conduct further examination into these design arounds. Furthermore, Ravin has, by MCP's admission, provided at least one design-around prior to serving its expert report, putting MCP on notice that Ravin intended to rely on design-around efforts in this case.

Since Ravin has demonstrated that any violation of Rule 26 that may have occurred is justified (since the design-arounds did not exist prior to MCP's opening expert reports) and since consideration of the four Seventh Circuit factors dictate that Ravin's omission was harmless (since MCP has ample time to conduct discovery into the identified topics), and since the facts of the instant case do not warrant such a drastic sanction as striking Ravin's expert testimony, the Court should deny MCP's Motion to Strike. *See David*, 324 F.3d at 857; *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).

## VIII.  CONCLUSION

For at least the foregoing reasons, Ravin respectfully requests MCP's summary judgment motion be denied.

Dated: May 22, 2023            Respectfully submitted,

By: /s/ *Adam P. Seitz*

Adam P. Seitz (pro hac vice)
KS Bar No. 21059
Email: adam.seitz@eriseip.com
Alex M. Matthews (pro hac vice)
KS Bar No. 29028
Email: alex.matthews@eriseip.com
Clifford T. Brazen (pro hac vice)
KS Bar No. 27408
Email: cliff.brazen@eriseip.com
**ERISE IP, P.A.**
7015 College Blvd., Suite 700
Overland Park, Kansas 66211
Telephone: (913) 777-5600
Facsimile: (913) 777-5601

J. Derek Vandenburgh
WI Bar No. 0224145
Email: dvandenburgh@carlsoncaspers.com
**CARLSON, CASPERS, VANDENBURGH
& LINDQUIST, P.A.**
225 South Sixth Street, Suit 4200
Minneapolis, MN 55402
Telephone: (612) 436-9618

Sarah A. Zylstra
State Bar No. 1033159
Email: szylstra@boardmanclark.com
**BOARDMAN & CLARK LLP**
1 South Pinckney Street, Suite 410
P.O. Box 927
Madison, WI 53701
Telephone: (608) 257-9521
Facsimile: (608) 283-1709

***Attorneys for Defendant RAVIN
CROSSBOWS, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2023, a true and correct copy of the above and foregoing document has been filed via ECF which will send notice to all counsel of record.

<u>*/s/ Adam P. Seitz*</u>
Adam P. Seitz